Thomas COSGROVE and Matilda
June Cosgrove, Plaintiffs,

v.

CIRCLE K CORPORATION; Circle K
Convenience Stores, Inc.; Fred Hervey;
The Fred Hervey Interests Employees
Benefit Plan, Defendants.

No. CIV 89–321–TUC–JMR.

United States District Court,
D. Arizona.

Dec. 21, 1995.

Erik M. O'Dowd, O'Dowd, Burke & Lundquist, P.C., Tucson, AZ, for plaintiffs.

Streich Lang, P.A., Susan G. Boswell, Craig H. Kaufman, Tucson, AZ, for Circle K Corp.

Lillick & Charles, D. Ward Kallstrom, Randall S. Farrimond, San Francisco, CA, for Fred Hervey.

## ORDER

ROLL, District Judge.

This is an action brought by Thomas Cosgrove as representative of the Fred Hervey Interests Employees' Benefit Plan ("the Plan"), a retirement plan sponsored by Circle K, under the Employee Retirement Income Security Act of 1974 ("ERISA").

Circle K froze the Plan and in 1986 purchased certain of its assets, consisting of 91 stores which the Plan owned or in which it had an interest. Circle K then terminated the Plan and distributed its assets to Plan participants. Plaintiffs maintain that (1) Circle K's acquisition of these stores constituted a prohibited transaction under ERISA § 406(a)(1)(A), 29 U.S.C. § 1106(a)(1)(A),[1] and does not come within the exemption found in § 408(e), 29 U.S.C. § 1108(e);[2] (2) Circle K was a fiduciary of the Plan[3] and violated its fiduciary duties by acquiring the stores under the circumstances presented, in violation of ERISA § 404(a)(1), 29 U.S.C.

---

**1.** ERISA § 406(a)(1)(A), 29 U.S.C. § 1106(a)(1)(A) reads:

§ 1106. Prohibited transactions

(a) Transactions between plan and party in interest

Except as provided in section 1108 of this title:

(1) A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect—

(A) sale or exchange, or leasing, of any property between the plan and a party in interest[.] ERISA § 3(14)(C), 29 U.S.C. § 1002(14)(C) defines "party in interest" as "an employer any of whose employees are covered by such plan[.]"

**2.** ERISA § 408(e), 29 U.S.C. § 1108(e) reads in pertinent part:

Sections 1106 and 1107 of this title shall not apply to the acquisition or sale by a plan of ... qualifying employer real property ...—

(1) if such acquisition, sale, or lease is for adequate consideration....

ERISA § 3(18)(B), 29 U.S.C. § 1002(18)(B) defines "adequate consideration" as "the fair market value of the asset as determined in good faith by the trustee or named fiduciary...."

**3.** ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) defines "fiduciary" as "a person is a fiduciary with respect to a plan to the extent (i) he ... exercises

---

§ 1104(a)(1);[4] and (3) the trustees of the Plan violated their fiduciary duties when they agreed to the sale of the Plan's interests in the stores for the amount Circle K offered, also in violation of ERISA § 404(a)(1).

## Procedural Background

This action was brought by Plaintiffs Thomas and Matilda Cosgrove in 1989. After very little discovery the district court granted defendants' motion for summary judgment on May 11, 1990. Appeal was taken to the Ninth Circuit Court of Appeals and on September 19, 1991, summary judgment was vacated and the matter was remanded for further proceedings. *Cosgrove v. Circle K Corporation,* No. 90–15881, 1991 WL 184805 (9th Cir. Sept. 19, 1991) (mem. decision). On July 21, 1992, a class, consisting of all persons who were participants in the Plan after December 31, 1984, was certified pursuant to Rule 23(b)(2), Fed.R.Civ.P.

Following extensive discovery and motion practice, the matter was tried in October of 1995 in a nine day court trial.

## Facts

The courts finds the facts, as presented at

---

any authority or control respecting management or disposition of its assets...."

**4.** ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1) reads in pertinent part:

§ 1104. Fiduciary duties

(a) Prudent man standard of care

(1) Subject to sections 1103(c) and (d), 1342, and 1344 of this title, a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—

(A) for the exclusive purpose of:
(i) providing benefits to participants and their beneficiaries; and
(ii) defraying reasonable expenses of administering the plan;

(B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;

....

(D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter or subchapter III of this chapter.

trial, to be as set forth below.[5]

*First Circle/Circle K 1973 sale/leaseback*

In May of 1973, Circle K entered a transaction with First Circle Properties, Inc. ("First Circle"). First Circle was a special purpose corporation created for this transaction. Circle K sold 79 convenience stores to First Circle for $5,493,300 and First Circle leased the stores back to Circle K for $523,-962.04 per year. The lease had an initial term of 25 years, with three consecutive five-year extensions at the same rent, at the option of Circle K. First Circle financed the acquisition by borrowing $5,493,300 from Massachusetts Mutual Life Insurance Co. ("Mass Mutual"). First Circle was obligated to retire the Mass Mutual loan over the first 25 years of the lease, with annual payments of $522,362.04.

*Creation of the Plan's interest in Circle K stores*

Also in 1973, the Plan acquired a reversionary interest in the ground under the 79 stores by exercising an option granted to it in the Circle K–First Circle transaction and paying First Circle $1,000. This agreement required that the Plan lease back to First Circle its interests in the stores. The lease terms provided that First Circle would pay the Plan $100 per year during the initial 25 year term of the lease. At the end of the 25 year term, the Plan would receive First Circle's interest in the property, that is, either the unencumbered fee simple interests in the properties or, if Circle K exercised its options, annual rent of $523,962.04 for up to another 15 years. Hereinafter these stores are referred to as the Plan's reversionary interest stores.

Plaintiffs' experts, including Greg Lee and Tim Prouty, testified that when the Plan paid $1,000 in 1973 for its interest in the 79 reversionary interest stores the agreement was not as favorable as an arm's-length transaction. Lee pointed to the nominal rent the Plan was to receive for 25 years as one unfavorable aspect of the agreement. Lee

also emphasized that the agreement provided for no possible market adjustment for 25 years, and had other shortcomings. Prouty stated that the Mass Mutual mortgage impeded the Plan's ability, as ground lessor, to further encumber the property. He testified that the Plan, as ground lessor, had no control over the lease or the mortgage.

The opinion of Lee and Prouty that the Plan was shortchanged by its 1973 investment of $1,000 is undermined by the benefits received by the Plan. These benefits included (1) nominal rent of $100 per year, which nonetheless constituted a 10 percent annual return on investment, and (2) receipt of $2,550,000 when the plan was compensated for its interest in these 79 stores in 1986. Thomas Cosgrove, the class plaintiff, testified that he believed the 1973 transaction was a favorable one for the Plan.

At various other times, Circle K conveyed to the Plan a fee interest in an additional 12 stores, subject to Circle K's leases. In 1986, ten of these twelve stores were subject to long-term leases.

*Bret litigation and settlement*

In 1982, a class action was filed by Plan participants in *Bret v. Hervey*, CIV 82–747 TUC–RMB ("*Bret* litigation"). In this action, the class alleged that Circle K, the Plan, and the Plan's trustees breached their fiduciary duties by making imprudent investments and incorrectly valuing the Plan's interests. Annual appraisals of the Plan's assets, required by the Department of Labor, had not been faithfully prepared. To aid in settlement of these claims, Wendell Montandon, M.A.I.,[6] was retained to appraise the value of the Plan's assets, including the 91 stores in which the Plan had an interest.

*1984 Montandon appraisal*

In appraising the Plan's interests in the stores, Montandon utilized an "income stream and reversion" methodology. This approach considered the contract rental payments for the 79 stores made to the Plan pursuant to the agreement with First Circle.

---

**5.** Additional specific findings of fact and conclusions of law are set out in this order following the narrative discussion.

**6.** M.A.I. indicates "Member of the Appraisal Institute" and is generally considered the most prestigious professional designation an appraiser can attain.

Accordingly, Montandon considered the Plan's receipt of $100 per year rent to the year 1998, the Plan's anticipated receipt of $523,962.04 from 1998 to 2013, and the present value of the Plan's reversionary interest in these 79 stores in 2013. He also considered the present value of the other 12 stores and the rent the Plan was entitled to receive pursuant to long-term leases on most of these stores. Montandon concluded that as of December 31, 1984, the fair market value of the Plan's interests in the 79 stores was $1,250,000 and the fair market value of the Plan's interest in the 12 other stores was $1,273,300.

On September 30, 1985, the district court approved an agreement resolving the *Bret* litigation. The agreement stipulated that the 1984 Montandon appraisal used "standard appraisal methods," was "fair and equitable," and established values "that may be deemed to be the values of the [Plan's assets, including the Plan's interest in the 91 stores] as of December 31, 1984." The agreement also provided that as to future valuations of Plan assets, "Defendants will propose to the court a plan for such valuations, and will ask the court to approve such plan as complying with ERISA...." The agreement provided that the class reserved "the right to contest the propriety of any such plan." Finally, the agreement released the defendants from "any and all claims [the class] may have against [Circle K and Hervey] in connection with ... valuation of the assets of the Plan."

*Circle K's decision to terminate the Plan*

In the early 1980s, Circle K acquired several rival convenience store chains. Typically, each chain had its own retirement plan. After Circle K acquired these various chains, it was required to manage the various retirement plans. Besides posing administrative problems, morale problems arose from the lack of uniformity in employee retirement benefits. Although plaintiffs concede that the reasons for the Plan's termination are not in issue, by early 1985 Circle K had decided to terminate all existing retirement

plans and replace them with a single plan. On July 31, 1985, Circle K froze the Plan.

*Sale of Plan's interests in the 91 stores*

In 1986, the Plan's three trustees were Fred Hervey, Robert Hutchinson, and Millard Orrick. Hervey, Circle K's founder, was Vice–Chairman of the Board; Hutchinson was president of Circle K and a board member; and Orrick was president of Sun World Corporation. Sun World was an affiliate of Circle K through Hervey's stock interests in both corporations. Only Hervey is a defendant here because Orrick died before this action was filed and Hutchinson previously entered into a *Damron* agreement with class plaintiffs. In doing so, he conceded no wrong-doing and paid nothing out-of-pocket.[7]

Because the Plan was being terminated, the trustees recognized it was necessary to liquidate its assets. One of the largest assets in the Plan at the time was its real estate interests in the 91 stores at issue here. This asset was problematical because it was illiquid, generated little cash flow, and Department of Labor regulations required yearly appraisals in some form. The trustees were concerned that the annual appraisals would significantly deplete the Plan's assets. Sale of the stores would solve these problems.

Circle K officials were receptive to this solution. The trustees approached Circle K attorney Jerry Busby and Robert Reade, Circle K's Vice President of Real Estate, concerning the possible sale of the Plan's stores to Circle K. In February 1986, Reade contacted Robert Zaboroski, an ERISA attorney with Circle K's outside corporate counsel, concerning the legality of Circle K's purchase of the Plan's interest in the 91 stores. Zaboroski first opined that Circle K was required to seek an administrative exemption. On further reflection, however, Zaboroski informed Reade that if Circle K paid fair market value for the Plan's stores and the Plan paid no commission on the sale, the Plan's sale of the stores to Circle K would

7. *Damron* agreements allow an individual defendant to settle with plaintiff by stipulating to entry of judgment against him or her and assigning to plaintiff the defendant's bad-faith claim against defendant's insurer. Plaintiff agrees not to execute the judgment on defendant's personal assets, limiting recovery to what can be obtained against the insurer. *Damron v. Sledge*, 105 Ariz. 151, 460 P.2d 997 (1969).

not be a prohibited transaction under ERISA § 406 because it would fall within the exemption of ERISA § 408(e). Robert Hutchinson, a very credible witness, testified that he was aware of Zaboroski's advice and relied upon it. Steve Bosse, a plaintiffs' witness who is an attorney involved in ERISA litigation, and defense witness Steve Sacher, an attorney who has been actively involved in ERISA litigation for the past several years and who was formerly an employee of the Department of Labor, both testified that Zaboroski's latter advice was sound.

Plaintiffs' expert Tim Prouty testified that the Plan's trustees should have taken an aggressive stance because the Plan had something Circle K wanted, *i.e.*, 75 stores required for a sale/leaseback agreement Circle K was negotiating ("Kathary II"). This testimony assumes that the Plan enjoyed the more favorable negotiating position in its discussions with Circle K. It did not. The Plan was being terminated and it was necessary for the Plan to liquidate its assets so that distribution could occur. Failure to liquidate in a timely manner could have resulted in significant adverse tax consequences for Plan participants. Of the 91 stores in which the Plan had an interest, 89 were encumbered by long-term leases. If the Plan failed to sell its interest in the stores to Circle K, the prospects for finding another purchaser were bleak. In addition, while Kathary II contemplated a 250 store sale/leaseback, nothing prevented a transaction involving a lesser number of stores. Finally, while plaintiffs argued that the Plan's stores were indispensable, as evidenced by 1987 post-Kathary II correspondence from a Circle K executive indicating that Circle K had no stores available for another sale/leaseback, substantial evidence was introduced that Circle K did have substitution stores in reserve for use in sale/leasebacks.

*1986 Montandon appraisal*

In anticipation of Circle K's possible purchase of the Plan's interest in the 91 stores, Circke K proceeded to retain Wendell Montandon, the same individual who had prepared the 1984 appraisal approved by all of the parties to the *Bret* litigation. However, Circle K did not seek approval of the court,

as required pursuant to the *Bret* settlement, before arranging for the 1986 valuation of the property. Montandon was instructed to use the identical methodology utilized in arriving at his appraisal of the Plan's stores in 1984. Once again, Montandon used the income stream and reversion methodology in arriving at his appraisal of the fair market value of the Plan's interest in the 91 stores. Montandon was not told that Circle K was negotiating a large sale/leaseback and intended to include a substantial number of the Plan's stores, once acquired, in it. However, Montandon was aware that Circle K frequently negotiated sale/leaseback transactions, and that once Circle K acquired the Plan's and other outstanding interests in the stores, these stores would be available for inclusion in a future sale/leaseback. Circle K did disclose to Montandon information relating to the Kathary II negotiations which Montandon referenced in determining an appropriate yield rate for use in the 1986 appraisal.

Montandon concluded that the fair market value of the 79 reversionary interest stores had risen from $1,250,000 in December 1984 to $2,550,000 in October 1986. He arrived at an October 1986 fair market value of $1,843,-700 for the other 12 stores. This was a substantial increase from the $1,273,300 at which he appraised the Plan's interest in these stores in 1984. The increased valuations resulted at least in part from Montandon's use of a lower yield rate in 1986 than the rate used in 1984. In 1986, Montandon utilized an 11 percent yield rate whereas in 1984 he had used a 13 percent yield rate. This inured to the benefit of the Plan in 1986. Montandon concluded that the lower yield rate of 11 percent was appropriate after reviewing information containing the rates of return of recent sale/leasebacks entered into by Circle K.

Greg Lee, an expert called by plaintiffs, testified that Montandon should have utilized a market rent approach in appraising the 91 stores, including the 75 later included in Kathary II. Lee estimated the 1986 market rental value of the 75 Kathary II stores to be $20,200,000. Alternatively, Lee suggested that a market data approach was appropriate. This approach considered "comparable

sales" of properties subject to leases and would have resulted in a fair market value of $12,120,000 for the 75 stores. Both such approaches ignore the fact that because of long-term leases encumbering virtually all of the 75 stores, the Plan was not free to insist upon rent more reflective of the current rental market. Furthermore, no evidence was presented that the "comparable sales" relied upon by Lee involved property as severely encumbered as the 75 Plan stores included in Kathary II.

*Plan trustees' decision to sell*

In his capacity as trustee for the Plan, Hutchinson discussed the potential sale to Circle K and Montandon's appraisal with the other two trustees. Orrick, due to failing health, was not as active as Hutchinson and Hervey in analyzing the potential sale of Plan assets to Circle K. Hutchinson had been a defendant in the *Bret* litigation by virtue of his status as Plan trustee. He was familiar with Montandon's 1984 appraisal. The trustees relied upon the fact that Montandon's 1986 appraisal methodology had been approved in the *Bret* settlement when his 1984 appraisal was accepted by all parties. Hervey, who had considerable experience with appraisals and who was conversant with the value of the Plan's 91 stores, pointed out that the 1986 appraisal was well above the 1984 appraisal. Hutchinson did not believe that any entity besides Circle K would be a likely buyer of the Plan's interests. The trustees realized that Plan participants faced adverse tax consequences unless distribution of the Plan assets occurred within one year of Plan termination, and that since Circle K had stopped making contributions to the Plan, an early termination was preferable.

None of the trustees contacted class counsel from the *Bret* litigation, an independent ERISA attorney, or an independent appraiser. Based on their own experience and knowledge, each of the trustees was satisfied that the 1986 Montandon appraisal accurately represented the fair market value of the Plan's interests in the 91 stores. Hutchinson testified that he experienced no pressure from Circle K to sell the Plan's stores and was unaware of any pressure being exerted.

Hutchinson was aware that Circle K was negotiating a 250 store, $100 million sale/leaseback but did not know that the Plan's stores were planned for inclusion. He testified that he was not concerned about Circle K's plans for the stores because he believed that any such plans were immaterial to the validity of the appraisal.

*The Plan's sale of its interest to Circle K*

On October 14, 1986, the Plan sold its interests in the 91 stores to Circle K. Circle K paid the Plan $4,393,700, the exact amount for which the Plan's interests in the 91 stores had been appraised by Montandon in 1986. Circle K paid the Plan $2,550,000 for its interest in the 79 reversionary interest stores and $1,843,700 for its interest in the other 12 stores.

In arguing that the Plan did not receive adequate consideration for the 91 stores, plaintiffs have primarily focused upon the sum paid by Circle K for the 79 reversionary interest stores. Of these 79 stores, 64 were ultimately included in Kathary II.

*Circle K's use of sale/leaseback agreements to raise capital*

Since at least 1984, Circle K had been aggressively acquiring stores and entering sale/leasebacks to raise operating capital. Between 1983 and 1988, Circle K expanded from 1,200 stores to 4,800 stores.

Although sale/leaseback transactions enabled Circle K to raise capital they also created long-term lease obligations. Oftentimes, these agreements obligated Circle K to repurchase the stores at the end of the lease period. Larry Zine, a certified public accountant and Circle K's chief financial officer during its Chapter 11 bankruptcy, filed in May of 1990, attributed Circle K's later financial adversities to debt financing arrangements such as these sale/leasebacks.

On April 24, 1986, Circle K entered a sale/leaseback with Robert Kathary. In this transaction, Circle K sold 238 stores to Kathary for $80 million, and agreed to lease back the stores with a future option to repurchase. This transaction has been dubbed Kathary I. When the transaction was completed, Kathary informed Circle K that he was interested in a future similar transaction.

*Circle K's negotiations and preparation re Kathary II*

Circle K did negotiate a second sale/lease-back with Kathary, dubbed Kathary II. This agreement was to involve Circle K's sale of 250 stores to Kathary for $100 million. Pursuant to the contemplated agreement, Circle K was to be obligated to lease back from Kathary each of the 250 stores for an annual rent of $39,000 rent per store for an initial term of seven years. Circle K could exercise options to extend the leases, but the rent substantially increased after the first five years. Each store in the package was assigned a value of $400,000. This was done so that stores could be substituted by Circle K, although any substitutions had to be agreed upon by both Kathary and Circle K.

Circle K initially tried to close Kathary II in October of 1986. Negotiations involving this sale/leaseback transaction were proceeding concurrently with Circle K's preparations to purchase the Plan's interest in the 91 stores. While the trustees were considering Montandon's appraisal, Circle K placed 75 legal descriptions of the Plan's stores in escrow in anticipation of concluding Kathary II by the end of October.

Circle K also proceeded to remove the other encumbrances on the 79 reversionary interest stores. On October 14, 1986, Circle K purchased the stock of First Circle for $250,000. On October 21, 1986, Circle K paid off the balance of the Mass Mutual mortgage which, with pre-payment penalty, totalled $4,097,364.34. On October 22, 1986, Circle K cancelled the leases, thereby vesting Circle K with a fee simple estate in each of the 91 stores acquired from the Plan.

Although Kathary and Circle K negotiated in earnest regarding Kathary II in the fall of 1986, Kathary did not have the $100 million required to close the transaction. For its part, Circle K was required to convey to Kathary a $20 million letter of credit, which its board of directors declined to approve in November 1986. Thereafter, Circle K entered negotiations for sale/leaseback transactions with other potential parties.

*Kathary II agreement*

The Kathary II agreement was eventually consummated, but not until April 28, 1987. It resulted in Circle K's conveyance of 250 stores to Kathary for $100 million. Among the 250 stores sold by Circle K were 75 of the stores recently acquired from the Plan. The stores in which the Plan previously owned an interest and which were included in the agreement included 64 of the 79 reversionary interest stores and 11 of the 12 fee simple stores.

*Extent to which Circle K profited from Kathary II*

Each of the 250 stores included in Kathary II was valued at $400,000, hence the purchase price of 100 million dollars. Of the 91 stores acquired by Circle K from the Plan, Circle K paid the Plan $3,829,523 for the 75 which were part of Kathary II. As to the 64 Kathary II stores subject to the Mass Mutual mortgage, Circle K paid $3,258,963 to retire the mortgage. Circle K also paid $202,-532 to acquire First Circle's interest in these 64 stores. Accordingly, Circle K paid $7,291,018 to acquire the unencumbered fee simple to these 75 stores.

Of the 100 million dollars to be received by Circle K in Kathary II, Circle K expended two million dollars on closing costs and ten million dollars in taxes on the gain attributable to the 75 stores obtained from the Plan. Most importantly, however, when Circle K entered the Kathary II agreement, its rent obligations became $39,000 per store per year. Under its prior lease with First Circle, Circle K paid $6,000 per store per year as rent on the 64 reversionary interest stores. As a result of Kathary II, the present value of Circle K's rent obligations on these 75 stores increased from $5,430,530 to $28,388,-825.

Mark Fleishman, a certified public accountant who testified for plaintiffs, stated that Circle K realized a profit of $22 million from the Kathary II transaction attributable to the 75 stores recently acquired from the Plan. Fleishman stated that Circle K was paid a total of $100 million for 250 stores. Each store had an assigned value of $400,000, and 75 of the stores in Kathary II were from the Plan; therefore Circle K received gross pro-

ceeds of $30 million attributable to the stores acquired from the Plan. Fleishman concluded that after Circle K's payment to the Plan for the 75 stores is deducted, as well as the pro-rated Mass Mutual mortgage pay-off and the pro-rated First Circle buy-out, Circle K realized $22 million profit from the sale of the 75 Plan stores. A grievous shortcoming of Fleishman's calculations regarding Circle K's profit from Kathary II, however, was the total disregard of Circle K's new rent obligations. Fleishman conceded that as to these 75 stores, prior to Circle K's purchase, Circle K's rent obligations totalled approximately $5.4 million. He further acknowledged that post-Kathary II, Circle K was saddled with rent obligations of approximately $28.3 million. He conceded that Circle K's rent had skyrocketed from $6,000 per store per year to $39,000 per store per year as to 64 of the 75 Plan stores included in Kathary II. Nevertheless, Fleishman insisted that the enhanced lease obligations assumed by Circle K as a result of Kathary II did not impact the profit realized by Circle K. Fleishman maintained that even had Kathary II lease obligations on these 75 stores obligated Circle K to pay $56 million or $100 million, Circle K nevertheless would have realized a $22 million profit from the sale of the Plan's 75 stores. Fleishman relied upon Circle K's tax return, which reported a $22 million gain as a result of its sale of the 75 stores previously owned by the Plan. Defense experts pointed out, however, that the $22 million reported as gain for 1987 was to be entirely offset by deductions claimed for succeeding years as a result of increased rent.

This testimony highlights contrasting views of experts regarding the nature of Kathary II. Plaintiffs' experts insisted that the lease obligations assumed by Circle K in Kathary II had no bearing on the amount of Circle K's profit. Defense experts countered that but for the enormous lease obligations assumed by Circle K, Kathary never would have paid $100 million for 250 convenience stores. On a broader basis, the conflicting experts highlight the enormously different perspectives obtained when Kathary II is seen only as a sale as compared to a sale/leaseback. In ascertaining Circle K's profit from Kathary II, no reasonable finder of fact could disregard the leaseback obligations assumed by Circle K.

*Genesis of this lawsuit*

After Thomas Cosgrove left employment with Circle K, he had occasion to research sales prices for convenience stores. While doing this research he reviewed the deeds on stores Circle K bought from the Plan and reconveyed; he was struck by the disparity between the amount Circle K paid for the Plan's interest in the 75 stores and amount the stores were sold for in Kathary II. At the time, Cosgrove was unaware of the elevated lease obligations Circle K assumed as part of Kathary II.

While the preceding narrative has summarized the court's finding of facts, additionally the court makes the following specific findings of fact:

### Findings of Fact

1. In 1973, the Plan received a reversionary interest in 79 convenience stores for which it paid First Circle Properties $1,000. Each of these stores was subject to a 25 year fixed-rate ground lease. The Plan was to receive $100 per year from these leases.

2. In 1998, at Circle K's option, the Plan was to receive either $523,962 annual rent for up to 15 years or the 79 stores in fee simple.

3. Even though the possibility existed that Circle K would not exercise its option to continue to lease the stores after 25 years, the more likely scenario was that Circle K would exercise its option of leasing the stores for an additional 15 years at $523,962 per year. This is so because for the years 1998 through 2013, annual rent of $523,962 would be advantageous to Circle K.

4. The 1973 interest in the 79 stores acquired by the Plan was at least as favorable as an arm's-length transaction and the Plan received adequate consideration for the $1,000 it was required to pay.

5. At other times, Circle K conveyed to the Plan a fee simple interest in an additional 12 stores, subject to its leasehold in these stores. In 1986, all but two of these stores were subject to long-term leases.

6. On September 30, 1985, the district court approved the *Bret* settlement, resolving a 1982 lawsuit over valuation and investment of Plan assets. The settlement involved Circle K, Plan trustees, and a class consisting of Plan participants. The agreement provided that in valuing the assets of the Plan, including the 91 stores in which the Plan had an interest, Wendell Montandon used "standard appraisal methods," was "fair and equitable," and established values "that may be deemed to be the values of the [Plan's interest in the 91 stores and other Plan assets] as of December 31, 1984."

7. The *Bret* settlement also required that Circle K or the trustees propose to the Court a plan for future valuations of the 91 stores. While this provision may have been included for the purpose of allowing the parties to fashion a valuation procedure which would avoid costly annual appraisals, neither the trustees nor Circle K complied with it.

8. The valuation method used by Montandon in connection with the 1984 appraisal of the 91 stores in which the Plan had an interest was the "income stream and reversion" methodology. This approach considered the contract rental payments made to the Plan and the present value of the Plan's interest in 79 reversionary interest stores and the Plan's fee interest subject to leaseholds in 12 stores.

9. The methodology used by Montandon in 1984 was acceptable methodology and was appropriate to arrive at an accurate fair market value of the interest that the Plan had in the 91 stores.

10. In 1984, Montandon valued the Plan's interest in the 79 reversionary interest stores at $1,250,000 and valued the Plan's interest in the other 12 stores at $1,273,300. These appraisals accurately reflected the fair market value of the Plan's interest in the 91 stores.

11. As a result of Circle K's acquisition of several rival convenience store chains in the early 1980s and difficulties encountered in administering the various retirement plans of each chain, Circle K decided to terminate existing retirement plans and create a single plan. Accordingly, on July 31, 1985, Circle K froze the Plan as a first step toward its termination.

12. In 1986, Fred Hervey, Robert Hutchinson, and Millard Orrick were the trustees for the Plan. Hervey was Vice–Chairman of the Board of Circle K, Hutchinson was president of Circle K and a board member, and Millard Orrick was the President of Sun World. Sun World was an affiliate of Circle K.

13. As a result of Circle K's intent to terminate the Plan, it was incumbent upon the trustees to liquidate the Plan's assets to facilitate distribution. Failure to distribute the Plan's assets within one year of the Plan's termination carried potentially serious tax consequences for Plan participants.

14. The Department of Labor required that an annual appraisal be filed as to the Plan's assets. Because of the relatively slight income being generated by the leases on 79 of the 91 stores, the cost of appraisals would deplete the Plan's assets. Prompt liquidation of the Plan's interest in the 91 stores was required in order to avoid annual appraisal expenses.

15. The trustees approached, among others, Robert Reade, who was Circle K's Vice President of Real Estate, concerning the possible purchase of the Plan's interest in the stores.

16. In February of 1986, Reade contacted ERISA attorney Robert Zaboroski to discuss the legality of Circle K's acquisition of the Plan's interest in the stores. Zaboroski informed Reade that if Circle K paid fair market value for the stores and the Plan paid no commission, it would not be a prohibited transaction under ERISA. The trustees, including Robert Hutchinson, were aware of Zaboroski's opinion.

17. In preparation for a possible sale, Circle K retained Wendell Montandon to once again ascertain the fair market value of the 91 stores in which the Plan had an interest. Montandon utilized the same income stream and reversion methodology he used in arriving at his 1984 appraisal.

18. Montandon was not told that 75 of the stores acquired from the Plan were being considered for inclusion in assemblage

of a sale/leaseback consisting of 250 stores. However, in order to assist him in valuing the stores, Montandon was furnished information concerning other recent sale/leasebacks completed by Circle K. Had Montandon known the details of the pending Kathary II transaction, it would not have affected his opinion as to the fair market value of the Plan's interest in the 91 stores.

19. Tom Cosgrove, class representative, would have expected that the stores acquired by Circle K would be included in a sale/leaseback.

20. Montandon concluded that in October of 1986, the 79 reversionary interest stores had a fair market value of $2,550,000 and the other 12 stores had a fair market value of $1,843,700.

21. The income stream and reversion methodology used by Montandon in arriving at the fair market value of the Plan's interest in the 91 stores was more appropriate than a market rent approach or a market data approach. Montandon's methodology correctly recognized that the Plan's interest in most of the stores was heavily encumbered by long-term ground leases. Because the Plan was bound by the terms set out in these leases, including the rent the Plan could receive, a methodology which focused upon the fair market rental value of the property would not accurately reflect the value of the Plan's interest in the stores. Comparable sales relied upon by Plaintiffs' expert Greg Lee were not demonstrated to be sales of interests similar to the Plan's heavily encumbered interest in most of the 91 stores.

22. Hutchinson discussed Montandon's appraisal with Orrick and Hervey. Hutchinson and Hervey realized that Montandon's method for the 1986 appraisal was the same as that approved by all sides in the *Bret* settlement.

23. Prudence did not require that the trustees consult with class counsel from the *Bret* litigation, another appraiser, or another ERISA attorney before deciding to accept Circle K's offer to purchase the Plan's interest in the 91 stores for the exact amount of Montandon's appraisal. Hervey was someone who was very familiar with appraisals

and who knew the value of the stores involved. The trustees believed that Montandon's appraisal represented the fair market value of the Plan's interest in the stores. Although no advice on the sale was received from any ERISA attorney other than Zaboroski, the advice that Zaboroski had given to Reade and which came to the attention of the trustees was sound advice as to what was required in order for the sale to avoid being a prohibited transaction under ERISA law. Hutchinson reasonably believed that only Circle K was a likely buyer of the Plan's interest in the stores. Hutchinson knew that Circle K was negotiating a 250 store sale/leaseback but did not know the identity of the 250 stores to be included in the package.

24. Hutchinson, as a Plan participant, was entitled to participate in the distribution of Plan assets. As a result of the sale of the Plan's interest in the stores to Circle K, Hutchinson received Plan benefits upon distribution in excess of $480,000.

25. On October 14, 1986, the Plan sold its interest in the 91 stores to Circle K for the precise amount Montandon had appraised them, *i.e.*, $4,393,700. Circle K paid $2,550,000 for the Plan's interest in the 79 reversionary interest stores and $1,843,700 for the 12 stores the Plan owned outright.

26. In the spring of 1986, Circle K had entered a sale/leaseback with Robert Kathary. Circle K received $80 million for 238 stores.

27. Since at least 1984, Circle K used sale/leasebacks as a financing technique. Through sale/leasebacks, Circle K raised large sums of capital but created long-term lease obligations, oftentimes including an obligation to repurchase the property. These financial arrangements contributed to Circle K's subsequent financial woes.

28. In order to accurately determine the profit obtained from a sale/leaseback, it is essential to consider not only the sale price but also the lease obligations assumed by the seller as part of the transaction.

29. While Circle K was preparing to purchase the Plan's interest in the 91 stores, it was negotiating with Robert Kathary for a

second sale/leaseback. The contemplated agreement involved the sale of 250 stores for 100 million dollars. Each store in the anticipated transaction was assigned a value of $400,000. This figure was utilized so that stores could be replaced if necessary, although replacement stores had to be approved by both sides. The agreement was to provide for annual rent of $39,000 on each store. Prior to October 1986, Circle K was paying approximately $6,000 annual rent on 64 of the 75 Plan stores ultimately included in the transaction. The transaction could have proceeded with less than 250 stores.

30. In preparation for the Kathary II transaction, Circle K officials caused the legal descriptions of 75 Plan stores to be placed in escrow prior to the time that the Plan had actually sold its interest in the stores to Circle K.

31. The Plan was under no less compulsion to sell its interest in the 91 stores than Circle K was under compulsion to buy. Although there was a great deal of activity in October of 1986 as Circle K completed the purchase of the other interests in the 79 reversionary interest stores, Circle K was under no compulsion to include these stores in Kathary II. The trustees therefore did not improperly forego an opportunity to bargain for a premium price above Montandon's appraised fair market value.

32. After Circle K purchased the Plan's interest in the 91 stores, it proceeded to obtain a fee simple in all 91 by purchasing the stock of First Circle for $250,000 and expending $4,097,364.34 to pay off the balance and pre-payment penalty on the Mass Mutual mortgage.

33. Despite earnest negotiations between Robert Kathary and Circle K in the fall of 1986, a Kathary II agreement was not entered at that time. Problems in finalizing the agreement included Circle K's failure to obtain board authorization for a $20 million letter of credit and Kathary's inability to procure the $100 million required for the transaction. The October 1986 agreement between Circle K and Kathary was not binding on either party. Thereafter, Circle K negotiated with other entities for a sale/leaseback of its stores.

34. On April 28, 1987, Circle K and Kathary consummated the Kathary II agreement. Circle K sold 250 stores to Kathary for $100 million. Each of the 250 stores conveyed by Circle K was assigned a value of $400,000. The 250 stores included 75 of the stores in which the Plan previously had an interest. Of these 75 stores, 64 of the stores were those in which the Plan had acquired its interests through the 1973 First Circle transaction and 11 were stores owned by the Plan outright, most of which were subject to long-term leases. Before Circle K conveyed these 75 stores to Kathary, it paid $7,291,018 to acquire the unencumbered fee simple.

35. A crucial feature of the Kathary II agreement was that Circle K was required to enter long-term leases with Kathary. The rent that Circle K was obligated to pay under Kathary II was $33,000 per year per store more for each of the 64 reversionary interest stores than Circle K had been paying under its prior lease to First Circle. As to the 75 stores, Circle K's rent obligations in present value terms increased from approximately $5,400,000 under the leases to First Circle and the Plan to approximately $28,000,000 under Kathary II.

36. The Kathary II agreement was a sale/leaseback and the leaseback was an indispensable component of the transaction. Kathary would not have paid $400,000 per store without Circle K agreeing to enter long-term leases as to each of these stores.

37. As part of the Kathary II agreement, Circle K was obligated to pay $2 million in closing costs. In addition, because Circle K was required to report a $22 million gain from the sale of the 75 stores Circle K had obtained from the Plan, it paid $10 million in taxes on the gain attributable to the sale of these stores.

38. The $22 million gain from the sale of these 75 stores reported by Circle K does not reflect Circle K's profit from Kathary II. While a $22 million gain was required to be reported to the Internal Revenue Service in 1987, in succeeding years Circle K was entitled to deduct the increased lease payments Circle K was obligated to make on these stores pursuant to Kathary II. In 1987, the

present value of those lease obligations was $28,392,500. The future lease payments would eventually extinguish the $22 million gain reported in 1987.

## Law

■ ERISA became effective in 1975. Prior to 1975, many retirement plans had existing agreements with sponsors under the terms of which sponsors received unduly beneficial leases of plan assets. Plaintiffs argue here that the transaction between Circle K, First Circle and the Plan was such an arrangement.

ERISA § 414(c)(2), 29 U.S.C. § 1114(c)(2),[8] is the so-called transition rule. Pre–ERISA agreements in which plans received adequate consideration from sponsors for plan assets are not covered by this provision because they are not prohibited by § 406. *Id.* Where plans had not received adequate consideration, however, the agreements could only be enforced until June 30, 1984 if the leases remained on terms at least as favorable as those an unrelated third party could have received in an arm's-length transaction.

In 1973 the Plan was a party to a sale/leaseback transaction. Plaintiffs argue that the 1973 agreement was unduly beneficial to First Circle and/or Circle K and was therefore subject to the transition rule. Plaintiffs argue that it was improper for Montandon to appraise the Plan's interest in the stores based on the below-market income stream. According to plaintiffs, in order for an income stream methodology to be proper here, the income stream should have been augmented so that the $100 annual rent received by the Plan was elevated to market rent. This argument disregards the fact that the Plan was not entitled to market rent. As consideration for its $1,000 investment, the

Plan received a reversionary interest in 79 stores and immediate right to annual rent of $100. This constituted adequate consideration for the Plan's $1,000 investment. Accordingly, the 1973 agreement is not covered by the transition rule. Montandon's methodology was proper.

■ The *Bret* settlement agreement approved by the court in 1986 must be construed under state contract law. *Air Line Stewards v. American Airlines, Inc.,* 763 F.2d 875, 877 (7th Cir.1985). Under Arizona law, estoppel may prevent a party from claiming a right if that assertion would be to the detriment of the other party and the other party was entitled to rely on the party's prior inconsistent conduct. *Graham v. Asbury,* 112 Ariz. 184, 186, 540 P.2d 656, 658 (1975).

■ As part of the *Bret* settlement, Circle K, the trustees and class counsel agreed to the accuracy of Montandon's 1984 appraisal of the value of the Plan's interest in 91 stores and the propriety of Montandon's methodology in calculating value. Montandon used the same methodology in reaching his 1986 appraisal as he did in arriving at his 1984 appraisal.

The *Bret* settlement released the defendants "from any and all claims [the class] may have against [Circle K] in connection with ... valuation of the assets of the Plan." The agreement also stated that Montandon's 1984 appraisal used "standard appraisal methods," was "fair and equitable," and established values "that may be deemed to be the values of the [91 stores and other Plan assets] as of December 31, 1984." This agreement estops plaintiffs from challenging the accuracy and validity of Montandon's 1984 appraisal and the validity of Montandon's 1984 appraisal methodology.[9]

8. ERISA § 414(c)(2), 29 U.S.C. § 1114(c)(2) reads:
 (c) Section 1106 and 1107(a) of this title (relating to prohibited transactions) shall not apply—
 (2) until June 30, 1984, to a lease or joint use of property involving the plan and a party in interest pursuant to a binding contract in effect on July 1, 1974 (or pursuant to renewals of such a contract), if such lease or joint use remains at least as favorable to the plan as an arm's-length transaction with an unrelated third party would be and if the execution of the contract was not, at the time of such execution, a prohibited transaction (within the meaning of section 503(b) of Title 26 or the corresponding provisions of prior law)[.]

9. Even assuming plaintiffs' prior conduct is insufficient on which to find estoppel, the fact that Montandon used the same methodology in 1986 as was accepted previously by plaintiffs was an

■ Circle K's 1985 decision to terminate the Plan was a business decision. *Hozier v. Midwest Fasteners, Inc.*, 908 F.2d 1155, 1162 (3rd Cir.1990).

■■ ERISA § 406(a) prohibits a fiduciary from engaging in a sale, lease or exchange of Plan property "between [the Plan] and a party in interest." 29 U.S.C. § 1106(a)(1)(A). However, ERISA § 408(e), 29 U.S.C. § 1108(e), provides for an exception to this rule "if such acquisition, sale or lease is for adequate consideration ...," no commission is charged, and the ERISA plan is an individual account plan. Adequate consideration is "fair market value as determined in good faith ..." 29 U.S.C. § 1002(18)(B). Under ERISA, fair market value is "the price that a willing buyer would pay a willing seller, both having reasonable knowledge of the pertinent facts." *Sommers Drug Stores v. Corrigan Enterprises, Inc.*, 793 F.2d 1456, 1461 (5th Cir.1986), *cert. denied*, 479 U.S. 1089, 107 S.Ct. 1298, 94 L.Ed.2d 154 (1987). Good faith requires that the trustees of the Plan have used a prudent method of determining value. *Donovan v. Cunningham*, 716 F.2d 1455, 1473–1474 (5th Cir.1983), *cert. denied*, 467 U.S. 1251, 104 S.Ct. 3533, 82 L.Ed.2d 839 (1984).

ERISA § 404(a)(1) obligates a fiduciary to discharge duties owed to a plan solely in the interest of participants and beneficiaries, using the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use. 29 U.S.C. § 1104(a)(1). ERISA § 406(b) prohibits fiduciaries from engaging in self-dealing. 29 U.S.C. § 1106(b).

■ The Plan's sale of its assets to Circle K in 1986 was not a prohibited transaction. The Plan received the fair market value as determined in good faith for its interest in the 91 stores. In the instant case, the Plan's trustees acted reasonably and prudently in relying upon the 1986 appraisal arrived at by Montandon. *See Elmore v. Cone Mills Corp.*, 23 F.3d 855, 864 (4th Cir. 1994) (en banc) (district court's findings "that defendants acted reasonably and prudently in the selection and retention" of an appraiser and "were justified in relying on [the] appraisal ..." were not clearly erroneous). The Plan trustees did not approve of the sale to benefit Circle K at the expense of the Plan. The trustees did not engage in self-dealing. Although the trustees were officers and/or board members of Circle K or a Circle K affiliate, this fact alone did not disqualify them from approving this transaction. ERISA § 408(c)(3), 29 U.S.C. 1108(c)(3); [10] *Donovan v. Bierwirth*, 680 F.2d 263, 267 (2d Cir.), *cert. denied*, 459 U.S. 1069, 103 S.Ct. 488, 74 L.Ed.2d 631 (1982).

■ In order for Circle K to be liable under ERISA § 409(a), 29 U.S.C. § 1109(a),[11] it had to be a fiduciary of the Plan. *Mertens v. Hewitt Associates*, 508 U.S. 248, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993). It was not. Circle K exercised no improper influence over the trustees in order to procure the Plan's agreement to the sale. "ERISA ... defines 'fiduciary' not in terms of formal trusteeship, but in *functional* terms of control and authority over the plan...." *Id.*, 508 U.S. at 262, 113 S.Ct. at 2071 (emphasis in original). Circle K was not a fiduciary of the Plan for purposes of the sale of Plan assets to Circle K because it did not

---

important factor reasonably relied upon by the trustees in deciding that Montandon's 1986 appraisal was adequate.

10. ERISA § 408(c)(3), 29 U.S.C. § 1108(c)(3) reads:
 (c) Fiduciary benefits and compensation not prohibited by section 1106
 Nothing in section 1106 of this title shall be construed to prohibit any fiduciary from—
 . . . .
 (3) serving as fiduciary in addition to being an officer, employee, agent, or other representative of a party in interest.

11. ERISA § 409(a), 29 U.S.C. § 1109(a) reads in pertinent part:

 § 1109. Liability for breach of fiduciary duty
 (a) Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary....

control the trustees' decision to sell. *Gelardi v. Pertec Computer Corp.,* 761 F.2d 1323 (9th Cir.1985); *Warren v. Oil, Chemical and Atomic Workers Pension Fund,* 729 F.Supp. 563, 566 (E.D.Mich.1989). Nor did Circle K violate the fiduciary duties assigned to it by Plan documents by placing into escrow legal descriptions of Plan assets not yet acquired.

 Likewise, the plaintiff class does not merit the equitable remedy of restitution. An action for restitution can be maintained pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3)[12] against a non-fiduciary party in interest to disgorge ill-gotten gains procured through a prohibited transaction. *Landwehr v. DuPree,* 72 F.3d 726, 733–34 (9th Cir.1995) (citing *Nieto v. Ecker,* 845 F.2d 868, 873 (9th Cir.1988)). The Plan received adequate consideration. Therefore, Circle K's purchase of the Plan's assets was not a prohibited transaction under ERISA § 406 because it came within the exemption of ERISA § 408(e). Furthermore, because Circle K paid the Plan the fair market value of its assets, it did not receive any ill-gotten profits from this transaction.

 Neither may plaintiffs recover from Hervey individually. A trustee who has breached his or her duty of loyalty may be required to disgorge "any profits he [or she] makes through improper use of the plan's assets." *Amalgamated Clothing & Textile Workers Union v. Murdock,* 861 F.2d 1406, 1411 (9th Cir.1988) (citing ERISA § 409(a)). Fred Hervey did not breach his duty of loyalty and, accordingly, did not profit from any such breach.

In addition to the above conclusions of law and conclusions of mixed questions of fact and law, the court makes the following specific legal conclusions:

### Conclusions of Law and of Mixed

### Questions of Fact and Law

1. The 1973 transaction in which the Plan paid $1,000 to First Circle as part of a sale/leaseback agreement was for adequate consideration.

2. The Bret settlement agreement released the defendants "from any and all claims [the class] may have against [Circle K] in connection with ... valuation of the assets of the Plan." The agreement also stated that Montandon's 1984 appraisal used "standard appraisal methods," was "fair and equitable," established values "that may be deemed to be the values of the [stores] as of December 31, 1984." This agreement precludes plaintiffs from relitigating the accuracy and validity of Montandon's 1984 appraisal and the validity of Montandon's 1984 appraisal methodology.

3. In 1984, Montandon appraised the Plan's interest in the 91 stores as having a fair market value of $2,523,300.

4. Circle K's decision to terminate the Plan was a business decision.

 5. The 1986 *Bret* settlement required that "[d]efendants ... propose to the court a plan for [future] valuations, and ... ask the court to approve such plan as complying with ERISA." This requirement was not complied with by Circle K or the trustees in obtaining Montandon's 1986 appraisal. Because this Court has previously ruled in its order of June 5, 1995 that the *Bret* settlement was a plan document governing the Plan, by not complying with the *Bret* settlement, the trustees violated their duties under ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).

 6. Because Montandon used the identical methodology in his 1986 appraisal that he utilized in the 1984 *Bret* settlement appraisal, and nothing occurred in the interim which made that methodology inappropriate for use in 1986, his 1986 appraisal fairly and accurately reflected the 1986 fair market value of the Plan's interest in the 91 stores. Circle K paid the Plan the full appraised value. Accordingly, the Plan suffered no loss and neither Circle K nor the trustees realized any gain as a result of Circle K's failure to obtain court approval of the 1986 valuation plan. Even had court approval been sought,

---

**12.** 29 U.S.C. § 1132(a)(3) reads in pertinent part:

§ 1132 Civil enforcement
 (a) Persons empowered to bring an action
 A civil action may be brought—

. . . .

 (3) by a participant, beneficiary, or fiduciary ... (B) to obtain other appropriate equitable relief (i) to redress such violations. . . .

this would not have resulted in Circle K paying a higher price than Montandon's 1986 appraisal.

7. Circle K's purchase of the Plan's interest in the 91 stores was for adequate consideration in that the price paid by Circle K reflected the fair market value of the Plan's interest in those stores. The Plan paid no commission on the sale of its interest in the stores to Circle K. The Plan was an eligible individual account plan. The 91 stores were qualifying employer real property.

8. Because Circle K's purchase of the Plan's interest in the 91 stores met the requirements of ERISA § 408(e), the purchase was not a prohibited transaction pursuant to § 406.

9. In approving of the sale of the Plan's interest in the 91 stores, the trustees did not breach their fiduciary duties of loyalty and prudence owed to the Plan pursuant to ERISA § 404(a)(1)(A) and (B). The trustees acted prudently in relying upon the 1986 appraisal furnished by Montandon in light of the imprimatur given to Montandon's 1984 methodology and appraisal by class counsel and then-participants of the Plan. The trustees determined the fair market value of the Plan's interest in the 91 stores in good faith. In recognizing the best interests of Plan participants, the trustees met their duties of loyalty and care in diligently pursuing liquidation of Plan assets and in agreeing to sell the Plan's interest in the 91 stores at the valuation arrived at by Montandon in 1986. The trustees did not engage in self-dealing. The trustees did not violate their duties of loyalty and prudence by failing to disclose the sale of assets to the *Bret* court, to *Bret* class counsel, or Plan participants in general.

10. Circle K was not a fiduciary of the Plan for purposes of the 1986 acquisition of the Plan's interest in the 91 stores. Circle K did not exercise discretionary authority over the Plan's assets, nor did it exercise any untoward influence over the trustees' decision to sell, so as to become a functional fiduciary pursuant to 29 U.S.C. § 1002(21)(A). When Circle K included legal descriptions of 75 stores in which the Plan had an interest in the package of 250 legal descriptions it placed in escrow in October of 1986 in anticipation of Kathary II's imminent closing, it did not violate any fiduciary duty it owed the Plan.

11. In failing to advise Montandon of the fact that it contemplated inclusion of a large number of the Plan's stores in the Kathary II agreement, Circle K did not breach any fiduciary duty.

12. Circle K exerted no untoward influence over the trustees in order to induce them to sell Plan assets to Circle K in 1986.

13. Even assuming Circle K functioned as a fiduciary in its purchase of the Plan's interests so as to be potentially liable under ERISA § 409(a), 29 U.S.C. § 1109(a), Circle K caused no loss to the Plan, and realized no profit as a result of its acquiring the Plan's interest in the 91 stores, the two bases by which § 409(a) measures damages against defalcating fiduciaries.

14. The Plan did not suffer any losses as a result of a breach by defendant Fred Hervey, and therefore ERISA § 409(a) imposes no damages against him.

This matter having been tried to the Court and submitted for decision.

**IT IS HEREBY ORDERED** that judgment shall be entered in favor of defendants Circle K and Fred Hervey and against plaintiffs.