**Howard R. MONTGOMERY, for himself and for all others similarly situated for themselves and for Aetna Plywood, Inc. Profit Sharing Plan as successor to Aetna Plywood, Inc., Employee Stock Ownership Plan, Nominal Defendant, Plaintiffs,**

v.

**AETNA PLYWOOD, INC., a Delaware corporation, Jeffrey Davis, John Francione, Peter C. John, and Peter Thomsen, Defendants.**

No. 95 C 3193.

United States District Court,
N.D. Illinois,
Eastern Division.

July 16, 1998.

Clinton A. Krislov, Sara Jane Wisenthal, Krislov & Associates, Ltd., Chicago, IL, Daniel A. Zazove, Barbara J. Yong, Chicago, IL, for plaintiffs.

Dean A. Dickie, Kathleen H. Klaus, D'Ancona & Pflaum, Chicago, IL, C. Barry Montgomery, Williams & Montgomery, Chicago, IL, Richard W. Culver, Barrington, IL, for defendants.

### AMENDED FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

HART, District Judge.

Following a bench trial, findings of fact and conclusions of law dated June 11, 1998 were issued. After issuance of the findings, the parties revealed that, during trial, defendants Peter John and Peter Thomsen had reached a settlement with the plaintiff class whereby they agreed to pay $800,000 to settle the claims against them. John and Thomsen are to pay this amount regardless of the outcome of the trial. The only contingency being that, because this is a class action, the settlement has to be approved by the court following notice to the class. The parties agreed that the existence of the settlement was not to be disclosed to the court until after findings of fact and conclusions of law had been issued. After the settlement had been reached, the parties continued to participate in the trial as if no settlement had occurred.

Because a settlement of a class action remains tentative until final approval by the court, the claims against John and Thomsen did not become moot upon the signing of the settlement agreement and this court did not lose jurisdiction to decide the case. Nevertheless, the need for entering findings and conclusions on the merits ceased absent disapproval of the settlement. Although John and Thomsen

urge the court to leave the findings fully intact and enter judgment on them, that would be an inappropriate action. Since signing the settlement, the parties' common interest was in having the settlement approved. It was inappropriate to keep the settlement secret. The parties no longer being in a fully adversarial relationship, findings are no longer appropriate. Even if the findings were to remain untouched, no judgment could be entered on them since the only judgment that can now be entered (absent disapproval of the settlement) is a judgment based on the settlement.

The findings and conclusions that follow replace the now vacated June 11, 1998 findings and conclusions. Those findings and conclusions that were pertinent only to John and Thomsen have been eliminated. The findings also add additional information that has been provided enabling the court to calculate damages and prejudgment interest through July 16, 1998.

## I. Introduction

This case is before the court after a bench trial for entry of findings of fact, conclusions of law and final judgment. Plaintiff Howard R. Montgomery brought this action under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, on his own behalf and on behalf of former participants in the Aetna Plywood, Inc. Employee Stock Ownership Plan (the "ESOP"). Jurisdiction is not contested. Federal courts have exclusive jurisdiction over actions brought pursuant to ERISA. Supplemental jurisdiction exists with respect to a state law corporate fiduciary claim.

Named plaintiff claims that the individual defendants are ESOP fiduciaries by virtue of being members of an ESOP committee, as well as officers and the directors of Aetna Plywood, Inc. ("Aetna" or the "Company"). Named plaintiff alleges that, in a leveraged buy-out at an undervalued price of $85.75 per share, defendants sold to the Company the controlling block of Aetna stock held by the ESOP.

A class was certified consisting of "[a]ll participants in the Aetna Plywood, Inc. Employee Stock Ownership Plan as of the June 1992 sale of the ESOP's shares of Aetna Plywood, Inc. to Aetna Plywood, Inc., excluding all defendants." *Montgomery v. Aetna Plywood, Inc.,* 1996 WL 189347 *6 (N.D.Ill. April 16, 1996) ("*Montgomery I*"), reconsideration denied, 1996 WL 189347 *2 (N.D.Ill. April 16, 1996).

Leave to amend was granted to add a stockholder fiduciary claim under Delaware law against defendants in their separate capacity as Aetna directors. See *Montgomery v. Aetna Plywood, Inc.,* 956 F.Supp. 781, 787–88 (N.D.Ill.1997) ("*Montgomery III*"). The state law corporate claim, which is not based on defendants' ERISA fiduciary status, is not preempted by ERISA. *Boston Children's Heart Foundation, Inc. v. Nadal–Ginard,* 73 F.3d 429, 439–40 (1st Cir.1996); *Sommers Drug Stores Co. Employee Profit Sharing Trust v. Corrigan Enterprises, Inc.,* 793 F.2d 1456, 1468 (5th Cir.1986), *cert. denied,* 479 U.S. 1034, 107 S.Ct. 884, 93 L.Ed.2d 837 (1987).

Leave to add a federal securities law claim was denied for want of standing, *Montgomery I,* 1996 WL 189347 at *2; a state law unjust enrichment claim (Count III of the first amended complaint) was dismissed as preempted by ERISA, Order dated Sept. 7, 1995; defendants' motion for summary judgment on statute of limitations grounds was denied, *Montgomery III,* 956 F.Supp. at 785–86; and plaintiffs' motion for summary judgment as to liability was denied, Order dated April 29, 1997.

Count I of the third amended complaint alleges a violation of 29 U.S.C. § 1104(a)(1) which requires that an ERISA fiduciary discharge his or her duties of loyalty in a prudent manner for the exclusive purpose of providing benefits to the ESOP participants. Named plaintiff claims that the purpose of the stock transaction was not for the benefit of the ESOP stockholders, but rather was to reacquire the ESOP

shares in order to vest sole control and ownership of the Company in defendant Davis at a price below market value. Named plaintiff also alleges that the price paid was based on a flawed valuation of the ESOP shares.

Count II of the third amended complaint alleges a violation of 29 U.S.C. § 1106 which prohibits self-dealing by ERISA fiduciaries. At the time of the transaction, all but 17 shares of Aetna were held by the ESOP. Defendant Jeffrey Davis, the president and a director of Aetna and a member of the ESOP committee, owned these remaining shares and became the sole owner of Aetna upon repurchase of the ESOP stock by the Company. However, the *per se* rules that prohibit fiduciary self-dealing are not applicable to all aspects of ESOP administration. There is a conditional exemption for the acquisition of employer securities if it is shown that the purchase was made for "adequate consideration." 29 U.S.C. § 1108(e). The parties agree that this exception provides an affirmative defense to what would otherwise be a prohibited transaction, but the burden shifts to the fiduciaries to prove that adequate consideration was paid. *See Howard v. Shay,* 100 F.3d 1484, 1488 (9th Cir.1996), *cert. denied,* 520 U.S. 1237, 117 S.Ct. 1838, 137 L.Ed.2d 1042 (1997). It must be shown that they arrived at their determination of adequate consideration in good faith by way of a prudent investigation and the application of sound business principles of evaluation. *Donovan v. Cunningham,* 716 F.2d 1455, 1467–68 (5th Cir. 1983), *cert. denied,* 467 U.S. 1251, 104 S.Ct. 3533, 82 L.Ed.2d 839 (1984).

Count IV of the third amended complaint alleges that, because the defendant directors and officers are on both sides of the stock sale transaction, they are required, under applicable Delaware law, to demonstrate, under a test of careful scrutiny, their utmost good faith and the inherent fairness of the bargain to the shareholders whose interests were purchased. Named plaintiff alleges that the stock transaction cannot pass such a test. Defendants admit that they carry the burden of proof with respect to Count IV.

ERISA provides that the term "adequate consideration" means "the fair market value of the asset as determined in good faith by the trustee or named fiduciary pursuant to the terms of the plan and in accordance with regulations promulgated by the Secretary [of Labor]." 29 U.S.C. § 1002(18)(B).

The Secretary has issued a proposed defining regulation, Proposed Regulation Relating to the Definition of Adequate Consideration, 53 Fed.Reg. 17632 (to be codified at 29 C.F.R. § 2510.3–18) (proposed May 17, 1988) ("Proposed Regulation").[1] The Proposed Regulation incorporates applicable statutory and trust law standards and furnishes a useful paradigm for asset valuation and analysis. Pertinent parts of the Proposed Regulation are as follows:

(2) **Fair Market Value.** (i) Except as otherwise specified in this section, the term "fair market value" as used in section 3(18)(B) of the Act ... means the price at which an asset would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, and both parties are able, as well as willing, to trade and are well informed about the asset and the market for such asset.

(ii) The fair market value of an asset for the purposes of section 3(18)(B) of the Act ... must be determined as of

---

1. Although the proposed regulation has not been formally adopted, the experts for both sides have acknowledged that it is widely considered and followed. It is referred to in the experts' reports, in the testimony of the experts and in a valuation treatise accepted by

defendants' expert as authoritative. *See* James H. Zukin, *Financial Valuation: Business and Business Interests* ¶ 8.2 (1990). *See, e.g., Scott v. Evins,* 802 F.Supp. 411, 415 (N.D.Ala.1992), *aff'd by unpublished order,* 998 F.2d 1022 (11th Cir.1993).

the date of the transaction involving that asset.

(iii) The fair market value of an asset for the purposes of section 3(18)(B) of the Act ... must be reflected in written documentation of valuation meeting the requirements set forth in paragraph (b)(4), of this section.

(3) **Good Faith**—(i) **General Rule.** The requirement in section 3(18)(B) of the Act ... that the fiduciary must determine fair market value in good faith establishes an objective, rather than a subjective, standard of conduct. Subject to the conditions in paragraphs (b)(3), (ii) and (iii) of this section, an assessment of whether the fiduciary has acted in good faith will be made in light of all relevant facts and circumstances.

(ii) In considering all relevant facts and circumstances, the Department will not view a fiduciary as having acted in good faith unless

(A) The fiduciary has arrived at a determination of fair market value by way of a prudent investigation of circumstances prevailing at the time of the valuation, and the application of sound business principles of evaluation; and

(B) The fiduciary making the valuation either,

(1) Is independent of all parties to the transaction (other than the plan), or

(2) Relies on the report of an appraiser who is independent of all parties to the transaction (other than the plan).

(iii) In order to satisfy the independence requirement of paragraph (b)(3)(ii)(B), of this section, a person must in fact be independent of all parties (other than the plan) participating in the transaction. For the purposes of this section, an assessment of independence will be made in light of all relevant facts and circumstances. However, a person will not be considered to be independent of all parties to the transaction if that person—

(1) Is directly or indirectly, through one or more intermediaries, controlling, controlled by, or under common control with any of the parties to the transaction (other than the plan);

(2) Is an officer, director, partner, employee, employer or relative (as defined in section 3(15) of the Act, and including siblings) of any such parties (other than the plan);

(3) Is a corporation or partnership of which any such party (other than the plan) is an officer, director or partner.

For the purposes of this subparagraph, the term "control," in connection with a person other than an individual, means the power to exercise a controlling influence over the management or policies of that person.

(4) **Valuation Content.** (i) In order to comply with the requirement in paragraph (b)(2)(iii), of this section, that the determination of fair market value be reflected in written documentation of valuation, such written documentation must contain, at a minimum, the following information:

(A) A summary of the qualifications to evaluate assets of the type being valued of the person or persons making the valuation;

(B) A statement of the asset's value, a statement of the methods used in determining that value, and the reasons for the valuation in light of those methods;

(C) A full description of the asset being valued;

(D) The factors taken into account in making the valuation, including any restrictions, understandings, agreements or obligations limiting the use or disposition of the property;

(E) The purpose for which the valuation was made;

(F) The relevance or significance accorded to the valuation methodologies taken into account;

(G) The effective date of the valuation; and

(H) In cases where a valuation report has been prepared, the signature of the person making the valuation and the date the report was signed.

(ii) **Special Rule.** When the asset being valued is a security other than a security covered by section 3(18)(A) of the Act ..., the written valuation required by paragraph (b)(2)(iii) of this section, must contain the information required in paragraph (b)(4)(i) of this section, and must include, in addition to an assessment of all other relevant factors, an assessment of the factors listed below:

(A) The nature of the business and the history of the enterprise from its inception;

(B) The economic outlook in general, and the condition and outlook of the specific industry in particular;

(C) The book value of the securities and the financial condition of the business;

(D) The earning capacity of the company;

(E) The dividend-paying capacity of the company;

(F) Whether or not the enterprise has goodwill or other intangible value;

(G) The market price of securities of corporations engaged in the same or a similar line of business, which are actively traded in a free and open market, either on an exchange or over-the-counter;

(H) The marketability, or lack thereof, of the securities. Where the plan is the purchaser of securities that are subject to "put" rights and such rights are taken into account in reducing the discount for lack of marketability, such assessment shall include consideration of the extent to which such rights are enforceable, as well as the company's ability to meet its obligations with respect to the "put" rights (taking into account the company's financial strength and liquidity);

(I) Whether or not the seller would be able to obtain a control premium from an unrelated third party with regard to the block of securities being valued, provided that in cases where a control premium is taken into account:

(1) Actual control (both in form and in substance) is passed to the purchaser with the sale, or will be passed to the purchaser within a reasonable time pursuant to a binding agreement in effect at the time of the sale, and

(2) It is reasonable to assume that the purchaser's control will not be dissipated within a short period of time subsequent to acquisition.

\*    \*    \*    \*    \*    \*

## II. FINDINGS OF FACT

Based on the testimony, exhibits and depositions presented at trial, and post-trial filings as to damages and prejudgment interest, the court finds the facts to be as follows:

1. ESOPs, such as the Aetna ESOP created in this case, are qualified profit-sharing plans under the Internal Revenue Code and ERISA formed to hold an employer's common stock. Employees thereby participate in the risk, benefits, growth and success of the enterprise. The administration of the Aetna ESOP is by a committee composed of individuals appointed by the board of directors of the Company. Under a written plan, an ESOP trust estate was established to acquire and purchase stock from Aetna and its controlling stockholders upon financing guaranteed by the Company. As the loan is paid by dividends or contributions, shares are allocated to employee accounts, which grow tax-deferred to the employees' retirement. Special income averaging and "rollover" provisions are available to minimize tax upon distribution from the ESOP.

2. There are significant tax incentives and estate planning advantages available to induce employers and controlling stockholders to establish and fund ESOPs. Employer contributions to an ESOP are

tax deductible to the employer. If a corporation uses an ESOP to obtain a loan, it will be entitled to take tax deductions with respect to both the interest and the principal payments on the loan instead of deducting the interest only. An institutional lender may exclude from its taxable income 50% of the interest received on a loan to an ESOP that owns 50% or more of the stock of the sponsoring employer, with the result that the interest rates on loans to such ESOPs are usually lower than on other commercial loans. Dividends paid in cash on shares held by an ESOP will be deductible if passed through to participants in the plan or if used to pay off a loan taken out by the ESOP to finance the purchase of company stock.

3. Controlling stockholders may sell their stock to an ESOP (as did the founders of Aetna) and defer any gain on the sale by reinvesting in another domestic corporation if the ESOP owns at least 30% of the sponsoring company after the sale (as it did in this case). As employees and officers of the Company, selling stockholders may also (as they did in this case) acquire interests in the ESOP along with other employees.

4. Employees who have a vested interest in ESOP shares may take those shares with them upon terminating their employment. Upon retirement, employees of a privately owned company have an option to "put" their shares back to a company and require a company to redeem the shares at their fair market value paid over a period of five years.

5. ESOPs are required by law to issue an annual valuation of a company's shares. The annual valuation is also used by a company to purchase the retiring employee shares "put" to the company.

6. Plaintiff Howard R. Montgomery is a vested participant in the Aetna Plywood, Inc. Profit Sharing Plan, the successor by merger to the ESOP, and was a vested participant in the ESOP at the time of the sale of the ESOP's Aetna shares. He brings this action individually, and as a class representative on behalf of all vested members of the ESOP at the time of the sale. Defendant Aetna Plywood, Inc. Profit Sharing Plan is the successor by merger to the rights of the ESOP, the assets of which·were merged into the Profit Sharing Plan after the stock transaction.

7. Defendant Aetna, a Delaware corporation, is a wholesaler of plywood and wood veneers. Aetna also sells particle board and various filler boards used in furniture and interior construction. In addition to wood products, Aetna is engaged in the wholesaling of plastic laminate material. Aetna's customers are principally large scale furniture and fixture manufacturers in Chicago. Aetna has recently entered the Columbus, Dayton and Cincinnati markets.

8. The Company was begun as a partnership of Don L. Davis and Arthur Schwanke in 1937. The business was incorporated in 1946. The ESOP was created in October of 1978. In the 1980's, the Schwanke and Davis families sold substantial blocks of stock to the ESOP. The ESOP committee was composed of members of the Aetna board of directors, some of whom were also officers of Aetna.

9. As of June 12, 1992, the date the stock transaction closed, Aetna's common stock·consisted of 100,000 shares authorized, of which 84,411 shares were issued and outstanding and 15,489 were treasury shares which had been acquired by the Company from ESOP participants.

10. Defendant Jeffery G. Davis ("Davis"), grandson of one of the founders, joined the Company in 1985. At the time of the 1992 repurchase of the ESOP shares, Davis was president of Aetna, a member of the board of directors, and a member of the ESOP committee. Shortly before the 1992 repurchase, Davis received by gift from his mother, her interest in 4,535 Aetna shares. Davis received cash for these shares at or before the time of the 1992 repurchase. Davis also had an ESOP participation in other shares of the

Company in his own name. After the 1992 repurchase, there were only 17 shares of Aetna stock outstanding that had not been acquired by Aetna. Those 17 shares were owned by Davis. As a result of the 1992 stock transactions, which were financed entirely by Company funds and company borrowings, Davis became the sole owner of the Company.

11. Davis is a well-educated (B.A. Michigan 1965, M.B.A. Harvard 1967) and experienced businessperson. Prior to joining Aetna in 1985, he worked for a number of large corporations and the business consulting firm of Booze, Allen & Hamilton.

12. Defendant John Francione ("Francione") was chief financial officer and a director of Aetna at the time of the sale. Francione has a degree in accounting and for seven years was an auditor with the accounting firm of Peat Marwick & Mitchell. He joined Aetna as its controller in 1966. From 1971 until July 9, 1992, he served as a member of the board of directors. He also served as a member of the ESOP committee. Francione held more than 5,000 Aetna shares in the ESOP at the time of the 1992 sale. Since retiring in 1994, Francione has received $380,000 from Aetna in consulting fees through the year 1997.

13. Defendant Peter C. John ("John") served as a director of Aetna and a member of the ESOP Committee from January 3, 1989 until July 9, 1992. Defendant Peter Thomsen ("Thomsen") joined the Aetna board on October 25, 1989. He was appointed to the ESOP committee on January 11, 1991. On July 9, 1992, after the stock sale transaction, Thomsen resigned from the Aetna board and the ESOP Committee.

14. During the trial of this case, John and Thomsen reached a settlement with the class that was subsequently memorialized in a letter agreement dated February 9, 1998. A fairness hearing as to approval of the settlement is set for September 3, 1998.

15. For many years, Aetna engaged SCS Management ("SCS"), headed by Oliver Turner ("Turner"), to prepare the required annual valuation of Aetna stock held by the ESOP. Throughout this period, Turner also gave advice to Davis and his father concerning the subject of Davis's control of the Company after the passing of his father. On March 16, 1987, Turner advised Davis to buy shares that his father took as distributions from the ESOP saying: "These shares in themself [sic], will not give you a great deal of percentage ownership, but it could mean a lot as the only owner outside of the ESOP."

16. Turner's valuations were used to fix the price for "put" transactions in which Aetna bought shares from retiring ESOP participants. Turner's valuations were essentially based on the per share book value of the stock, less deductions to represent the lower value of a minority stock interest and the effect of "put rights." Low or conservative annual valuations required the least expenditure by the Company, when purchasing the stock of retiring employees.

17. In March of 1991, Francione sent a memo to the directors expressing his concern regarding Aetna's estimated "put" liability over a five-year period. On June 10, 1991, he sent another memo to the board recommending redemption of a portion of the ESOP shares. The memo states:

> In nutshell we have approximately $3,000,000 in excess cash at present. Our line of credit at Lake Shore could produce another $4,000,000. Therefore we could make available $7,000,000 in cash. We are committed to $900,000 for a new office building.

The Aetna board, at the request of defendant John, directed that the Company engage the accounting firm of Deloitte & Touche to make an estimate of the Company's "put" liability. The Deloitte & Touche study estimated the repurchase liability over a number of years. The cumulative payment obligation was estimated to be approximately $1.6 million through a

five-year period ending 1996. The obligation was well within Aetna's financial capability and did not then or thereafter require that Aetna take steps to eliminate its ESOP.

18. At the December 18, 1991 meeting of the Aetna board, the issue of a buy-back of the ESOP Aetna shares was again discussed. It was agreed that Davis would obtain a written statement of the procedure for a buy-back program for the Aetna stock held by the ESOP and would obtain an opinion of alternatives and cost. It was also decided to seek outside legal advice concerning the options available to the Company.

19. At the December 1991 meeting, Davis reported to the board that the effect of the resignation of George Bryson, the vice-president in charge of sales, was "minimal" and a "non-issue ."

20. On January 7, 1992, Turner wrote to Davis regarding financing for the Company's purchase of its stock from the ESOP. Turner proposed that he be retained by the Company and its board of directors to acquire the stock from the ESOP. His fee proposal included the suggestion that he arrange for financing and be allowed a percentage commission on the financing provided to Aetna.[2]

21. Attorney Kurt Schmeltzer was engaged by Davis and the Company to render legal advice concerning a possible purchase of ESOP shares by the Company. In a written opinion dated January 17, 1992, the board was advised, in part, as follows:

> Although there are a number of issues that need to be discussed in connection with this transaction, of paramount importance is the purchase price to be set for the ESOP equity that is to be purchased by the company. An ESOP fiduciary (most likely the trustee) faced with the choice of whether to sell the ESOP

stock must determine that the price of the sale is "prudent" within the meaning of Section 404(a)(1)(B) of the Employee Retirement Income Security Act of 1974. The fiduciary also must make its decision in a manner which is for the exclusive benefit of the ESOP participants and their beneficiaries. The question of fiduciary prudence in the context of purchasing and selling employer stock has been the subject of several cases. Generally, the cases hold that the determination of whether adequate consideration has been paid to the ESOP is itself a matter of fiduciary prudence, that the fiduciary need not become an expert in valuing the stock as long as it hires qualified advisors, and that the appraisal which is relied upon by the fiduciary to establish the price must be up to date as of the time of the purchase. Simply put, the ESOP fiduciary, in carrying out its fiduciary duties in a transaction of this type would have to insist on the issuance of a fairness opinion from an independent valuation firm. Obviously your ability to terminate the plan and fully redeem all stock depends on the valuation since I assume that financing will only be available at certain price levels. Thus, the first and most important step to be taken if the board determines to terminate the ESOP and redeem stock, would be the receipt of a fairness opinion. Only then could the contemplated redemption take place and the plan be terminated.

22. Turner was employed by Davis and Francione on behalf of the Company to evaluate the ESOP stock value and to investigate the financing options available to Aetna. Turner's valuation opinions were rendered to Davis and to the Company, but not to the ESOP committee or to the independent ESOP committee members, John and Thomsen. Davis and Francione, with whom Turner dealt, had

---

**2.** The ERISA statute prohibits any commission in transactions involving an employer's stock. 29 U.S.C. § 1108(e)(2). Davis apparently did not accept this aspect of the proposal.

conflicts of interest because of their interests in the Company and in the transaction. There is no evidence that Turner ever conferred with, or reported separately to, John or Thomsen, the only fiduciaries without any interest in the transaction.

23. Turner was not independent of Davis or the Company. It was in the Company's and Davis's interest to acquire ESOP shares at the lowest possible price. Nevertheless, Turner's valuation was utilized by all the fiduciaries in fixing the price to be paid to the ESOP participants. On January 30, 1992, Davis wrote to Francione stating: "Per Ollie Turner $85.75 is the ESOP value. If you need any further info *do not* call Ollie. Call me in Indianapolis."

24. On February 5, 1992, Turner issued a written opinion valuing the Aetna stock at $85.75 per share as of October 31, 1991. On May 13, 1992, Turner issued an updated opinion for the interim period ending April 30, 1992, based on financial performance for the twelve months ending April 30, 1992 (unaudited), valuing the stock at $85.00 per share. Other opinions were thereafter sought from Walter Zweifler ("Zweifler") of Zweifler Financial Research and Edward Cerar ("Cerar") of Corporate Valuation Specialists, Inc., to confirm the opinion expressed by Turner.

25. The minutes of the Aetna board and shareholders meeting held April 10, 1992 state, in part:

(a) Francione reported that March 1992 was the best month of the fiscal year; that gross profits had been increasing steadily over the last six weeks and that the Company was 10% ahead of the last year although expenses had increased.

(b) Turner made a presentation on the diversification of the ESOP.

(c) At the suggestion of John, and over the objection of Davis who thought it unnecessary, it was determined that the ESOP committee would send a letter to the ESOP participants seeking their views concerning sale of the Aetna stock held by the ESOP.

(d) Aetna had received commitments from three banks to provide financing of $7 to $8 million, allowing the redemption of all outstanding stock.

(e) The shareholders adopted a by-law restricting stock ownership to employees and the ESOP trustee.

26. A letter, dated April 24, 1992, was sent to the ESOP participants, informing them that the ESOP Committee believed it would be prudent to convert the Company stock in the ESOP to more diversified and liquid investments because it would "be more prudent for a retirement plan" to invest retirement funds in investments "with a proven track record for growth" and eliminate the risk of dependence on "the performance of the company."

27. The letter to the ESOP participants stated that the value of the Company stock at October 31, 1991 was $85.75 per share. A chart comparing the growth of a fund administered by the Lake Shore National Bank and the value of the Aetna stock in the ESOP between January 1, 1981 and the end of the year 1991 was attached to the letter. According to this chart the Lakeshore fund grew in value 530% while Aetna stock grew only 209%. However, the participants were not furnished with Aetna financial statements or told that the book value of the stock exceeded $140. Nor were they told that the Aetna stock valuation was based on the net book value, discounted 40% for lack of marketability and repurchase liability.

28. The ESOP participants were also told that, after the purchase of the ESOP stock by the Company, the common stock ownership would be "4500 shares held by the Davis family." John and Thomsen, the outside directors, were not informed that Davis would be the sole owner of the Company by virtue of his ownership of only 17 Aetna shares outstanding after the transaction.

29. ESOPs, organized as they are with the purpose of holding an employer's securities, are specifically exempt by law from trust investment diversification standards with respect to employer securities. 29 U.S.C. §§ 1104(a)(2), 1107(b)(1), 1107(d)(5) & (6). Moreover, the financial condition of Aetna in April of 1992 did not otherwise require or support the sale of the ESOP stock in order to minimize investor risk. Aetna was emerging, along with the economy in general, from the low part of a business cycle and had a very strong balance sheet. No other aspect of the Company's business, such as the resignation of the sales vice-president (which the board had been told was a non-issue) or the relative success of new branch offices, warranted the Company's purchase of the ESOP stock in order to minimize investor risk. Rather, the evidence shows that the actions taken by defendants Davis and Francione to acquire the ESOP stock were in furtherance of a plan to have Davis become the sole owner of the Company.

30. A special meeting of the Aetna board of directors was held on May 5, 1992 (before the issuance of either the Zweifler or Cerar opinions) to approve the ESOP purchase. Directors John and Thomsen were present by telephone. The following resolution was adopted:

WHEREAS, the Board of Directors of this Corporation (the "Board") deems it to be in the best interests of the Corporation for the Corporation to purchase from the Aetna Plywood, Inc. Restated Employees Stock Option Plan (the "ESOP") all of the shares (the "ESOP Shares") of capital stock of the Corporation presently owned by the ESOP, at a price per share not less than $85.75; and

**WHEREAS, the ESOP is willing to sell the ESOP Shares to the Corporation at such price;** and

WHEREAS, the Directors have further determined that it is in the best interests of the Corporation to finance the purchase price for the ESOP Shares with the proceeds of a loan (the "Loan") to the Corporation from Lake Shore Bank (the "Bank") secured by the inventory, accounts receivable, machinery and equipment and real property of the Corporation, on terms substantially as set forth in the Commitment Letter dated May 6, 1992 heretofore issued to the Corporation by the Bank (the "Commitment");

NOW, THEREFORE, BE IT RESOLVED, that this Corporation purchase from the ESOP, all the ESOP Shares, being 79,876 shares, at a purchase price per share not less than $85.75; and

FURTHER RESOLVED, that the Corporation obtain an appraisal of the value of the ESOP Shares from an independent party, in order to confirm that a price per share not less than $85.75 would be a fair price; and

FURTHER RESOLVED, that the President of the Corporation be, and he hereby is, authorized and directed, upon receipt of such appraisal of the ESOP Shares, to establish the purchase price for such shares, consistent with these resolutions; and

FURTHER RESOLVED, that the Corporation accept the Commitment, and

FURTHER RESOLVED, that the Corporation borrow from the Bank, from time to time, up to $9.0 Million, on the terms and conditions set forth in the Commitment, or on such other terms and conditions as the President or Treasurer of the Corporation may approve; and

FURTHER RESOLVED, that, to the extent required by the Bank, the Corporation grant to the Bank a first security interest in the inventory, accounts receivable, machinery and equipment and real property of the Corporation to secure the Loan to the Corporation by the Bank, as more fully set forth in the Commitment; and

FURTHER RESOLVED, that any one of the President, any Vice–President, or the Treasurer of the Corporation be, and each of them hereby is, authorized and directed to execute, acknowledge (to the extent required) and deliver on behalf of the Corporation, any and all documents, including but not limited to a loan and security agreement and one or more promissory notes and any and all documents required thereunder, which may be necessary or which any of them may deem advisable to consummate the purchase of the ESOP Shares, the borrowings from the Bank pursuant to the Commitment and any and all other transactions contemplated thereby or hereby or incidental thereto or hereto.

(Emphasis supplied.)

31. On May 6, 1992, the Lake Shore National Bank issued a written financing commitment totaling $9,500,000 for the ESOP stock acquisition and the construction of a new 30,000 square foot Aetna office building in Lake Zurich, Illinois. In connection with the financing commitment, Aetna's historic and estimated future sales were contained in the bank proposal. Audited sales for the 12 months ending October 31, 1991, were $54,084,000. Estimated sales, pro forma for twelve months ending October 31, 1992, were $58,000,000, consistent with the upward sales trend reported to the board in March of 1992. (Actual sales for twelve months ending October 31, 1992 were $60,347,505.) The financing proposal was accepted by Davis on May 8, 1992.

32. Zweifler issued an appraisal valuing the Aetna shares at $85.00 per share as of June 1, 1992. Zweifler was referred to Davis by Turner and retained by Davis to perform the valuation. His report was based, in part, on information provided at meetings with Davis and Francione. There is no evidence that Zweifler ever held any personal meetings with John or Thomsen either before or after submitting his valuation opinion.

33. On June 8, 1992, Cerar issued a written opinion stating that the price of $85.00 per share was, from a financial point of view, fair to the ESOP. Unlike the Turner and Zweifler reports, the Cerar opinion letter contains no analysis or reasons explaining why he agreed that the $85.00 price was fair to the ESOP holders. There is no evidence that Cerar ever met with the independent ESOP committee members.

34. Although the issue of adequate consideration is not to be determined by events after a sale, the details of the stock and financial transactions of Aetna and the defendants at the time of, and subsequent to, the ESOP stock transaction are relevant to the prudence of the investigation, the fairness of the transaction to the ESOP participants and the specific nature of the conflict of interest of the defendants. All the actual benefits to the buyer and the known prospects of the Company are properly considered for the purpose of determining whether or not fair market value was paid.

35. According to the audited financial statements for the fiscal year ending October 31, 1992, on June 12, 1992 Aetna purchased 79,876 shares of outstanding stock from the ESOP for $6,849,367. Also, during the year the Company acquired 8,719 shares from separating ESOP participants for $747,654. This included shares held by Davis or his family. The Company retired a total of 99,983 shares of treasury stock leaving only 17 shares held by Davis outstanding. Davis caused these shares to be split into 100,000 shares. Aetna, or Davis, then elected to be taxed under the provisions of Subchapter S of the Internal Revenue Code for the years beginning after October 31, 1992. Pursuant to the election, earnings are taxed at the stockholder level, and company distributions are made to the stockholder to pay income taxes attributable to company earnings.

36. In addition to the amounts expended on stock acquisitions during the fiscal

year ending October 31, 1992, Aetna spent $650,000 on construction of the new office building. Substantial portions of the amounts expended came from cash on hand. Short term bank borrowings at fiscal year end 1992 were $4,650,000 from the revolving lines of credit and no funds had been drawn on the general term loan commitment.

37. During 1993, Aetna incurred $489,050 of additional building construction costs. Upon completion of the building, title was transferred to Davis in exchange for a note receivable in the amount of $1,140,000. The building was leased to the Company by Davis for a monthly rental of $8,000.

38. In the years prior to the stock purchase from the ESOP, Aetna did not pay dividends on its common stock. In the five years following the purchase, Davis, as sole shareholder, received the following dividends:

| | |
|---|---|
| 1993: | $ 571,320 |
| 1994: | $3,458,308 |
| 1995: | $1,268,872 |
| 1996: | $ 370,627 |
| 1997: | $1,389,580 |
| TOTAL | $7,058,707 |

Aetna's dividend paying capacity was not addressed in the Turner, Zweifler or Cerar valuation studies or in the testimony of defendants' expert.

39. In addition to the dividends paid, Davis's salary and bonus compensation increased after 1991 as follows:

| | Salary | Bonus |
|---|---|---|
| 1991 | $118,000 | $ 90,000 |
| 1992 | $195,000 | $100,000 |
| 1993 | $267,000 | $200,000 |
| 1994 | $365,000 | $270,000 |
| 1995 | $405,000 | |
| 1996 | $216,000 | |

40. The audited Aetna balance sheet as of October 31, 1991, and the audited statement of Aetna's earnings for the fiscal year ending October 31, 1991, were as follows:

## AETNA BALANCE SHEET AT OCTOBER 31, 1991

### ASSETS

CURRENT ASSETS

| | |
|---|---|
| Cash | $ 4,227,201 |
| Accounts receivable less reserve for bad debts | 6,599,191 |
| Inventories | 4,207,317 |
| Other current assets | 88,502 |
| Deferred income taxes | 236,575 |
| Total current assets | 15,358,786 |
| PROPERTY, PLANT and EQUIPMENT at cost | 3,155,020 |
| Less accumulated depreciation | (2,081,994) |
| | 1,073,026 |
| OTHER ASSETS | 225,717 |
| | $16,657,529 |

### LIABILITIES AND STOCKHOLDERS' EQUITY

CURRENT LIABILITIES

| | |
|---|---|
| Accounts payable | $ 1,575,230 |
| Due to officers and employees | 1,465,479 |
| Accrued salaries and bonuses | 631,000 |
| Taxes other than income taxes | 137,572 |
| Accrued ESOP | 360,633 |

| | |
|---|---:|
| Profit sharing contribution | 168,869 |
| Other current liabilities | 33,586 |
| Income taxes payable | 93,000 |
| Total current liabilities | 4,465,369 |
| DEFERRED COMPENSATION | 275,000 |
| STOCKHOLDER'S EQUITY | |
| Common stock | 100,000 |
| Capital in excess of par value | 19,310 |
| Retained earnings | 12,854,294 |
| Capital and retained earnings | 12,973,604 |
| ESOP stock restriction | (360,633) |
| Treasury stock at cost | (695,811) |
| Total stockholders' equity | 11,917,160 |
| | $16,657,529 |

### AETNA STATEMENT OF EARNINGS
#### Year ended October 31, 1991

| | |
|---|---:|
| Net Sales | $54,083,750 |
| Cost of sales | 43,661,033 |
| Gross profit | 10,422,717 |
| Operating Expenses | 9,081,886 |
| Earnings from operations | 1,340,831 |
| Other income | 259,880 |
| Earnings before income taxes | 1,600,711 |
| Income taxes | 627,123 |
| NET EARNINGS | $ 973,588 |

41. In support of their stock valuations, Aetna, and the valuation experts retained by it, relied, in part, upon Aetna's unaudited financial data for the twelve months ending April 30, 1992, which was less favorable than the 1991 fiscal year and historic data. However, in early 1992, Aetna (as well as the economy generally, according to the experts) was coming out of a business slump. Aetna's sales were going up (as reported to the board on April 10, 1992) and typically are strongest in the spring and summer months. Historically, Aetna's business has also been cyclical, tending to follow the economy. The focus on the twelve months ending April 30, 1992, failed to take into account then existing favorable Aetna data, favorable general economic data, and historic Aetna financial data, which is strongly confirmed by Aetna's performance both before and after 1992.

## AETNA'S AUDITED FINANCIAL RESULTS
### 1987 – 1997

| Fiscal Year | Sales | Gross Profit | Net Earnings |
|---|---|---|---|
| 1987 | $ 50,465,000 | $ 8,493,182 | $ 1,053,792 |
| 1988 | 55,040,000 | 9,711,540 | 1,504,568 |
| 1989 | 59,766,904 | 10,685,009 | 1,517,597 |
| 1990 | 58,449,712 | 10,761,559 | 1,139,386 |
| 1991 | 54,083,750 | 10,422,717 | 973,588 |
| 12 mos. ending 4/30/92 (unaudited) | $ 57,993,000 | $10,810,000 | $ 831,000 |
| 1992 | 60,347,505 | 10,907,265 | 495,818 |
| 1993 | 65,552,816 | 11,888,331 | 1,993,848 |
| 1994 | 71,902,657 | 12,673,455 | 2,317,609 |
| 1995 | 65,922,077 | 11,450,769 | 1,318,401 |
| 1996 | 64,028,983 | 11,582,983 | 571,157 |
| 1997 | 74,205,349 | 13,071,001 | 1,571,410 |

42. In order to obtain confirmation of the Turner valuations of Aetna's common stock Aetna sought the opinion of Zweifler. Zweifler's written appraisal included a study of price earnings ratios, capitalization of future earnings and adjusted equity values. The examination of these factors and most of the values suggested are within the ranges proposed by all of the experts in the case. However, the Zweifler appraisal contained three valuation errors that seriously undermined his conclusions.

43. In calculating per share value, Zweifler divided total equity and book value by 100,000 authorized shares rather than by the actual number of shares outstanding. At the time period he chose, April 30, 1992, 84,411 shares were outstanding and 15,589 shares were treasury shares. It is elementary, as admitted by the testifying experts, that treasury shares belong to all of the stockholders, increase the value of all shares and are not included when dividing total equity by shares outstanding to obtain per share book value. Adjusting for this error alone, dramatically increases the valuation proposed by Zweifler. Zweifler states, for example, that the per share book value of the stock (at April 30, 1992) is about $120 per share ($11,994,-939 ÷ 100,000 = $120). Correcting for the actual number of shares outstanding, shows that the book value was $142 per share ($11,994,939 ÷ 84,411 = $142) at that date.

Davis saw the per share book value error in Zweifler's analysis, but chose to ignore it.

44. Zweifler reduced the Company valuation by $6 million based on a hypothetical liability of the Company over six years when ESOP participants would be expected to exercise their right to "put" $6 million in shares back to the Company. This unsupported adjustment is a fiction. The reality of the stock transaction is that the stock acquired had no put rights. Such option only existed in favor of retiring employee participants when the stock was in the ESOP trust. The acquired shares that had such rights were retired and new shares were issued to the new owner. Adjusting for this valuation error adds $71 to the per share value ($6,000,000 ÷ 84,411 = $71).

For the reasons just stated, Turner's related 15% discount of book value for repurchase liability, in his February and

May 1992 appraisals, is also unsound and is rejected.

45. Zweifler opined that a 75% marketability discount should be applied because the Company's shares were owned and closely held, but suggested that a control premium of 30% was appropriate, resulting in a net discount of 45%. Considering again the nature of the transaction, no marketability discount was appropriate. Rather the valuation question to consider was the amount of the control premium to be added. What should have been analyzed was the sale of total ownership and control to a very small minority stockholder by utilizing company assets and leveraging the ownership of the ESOP stockholders to finance the buy-out. It was intended that Davis become, and he did become, the sole owner of the Company with the opportunity to reap substantial monetary and ownership benefits at no cost to himself.

As stated by the Secretary of Labor in explaining the Proposed Regulations for determining adequate consideration, "a plan selling control should receive a control premium." 53 Fed.Reg. at 17636. If applied to book value, the 30% control premium suggested by Zweifler would add $43 to the per share book value ($142 × .30 = $43), indicating a total value in the range of $185 per share.

For the reasons previously stated, Turner's similar discount of book value for lack of marketability, in his February and May 1992 appraisals, is also unsound and is rejected.

46. Cerar, who was retained to issue a fairness opinion of the stock transaction, wrote a two-page letter that states nothing more than that $85.00 per share is fair to the ESOP participants. His letter recites reliance upon the opinions of Turner and Zweifler and information supplied by the Company. There is no evidence that Cerar ever discussed the transaction with the independent members of the ESOP committee, John and Thomsen, and there is nothing in his letter analyzing the transaction.

47. In a deposition, Cerar conceded that there were several errors in the Zweifler valuation study which are not reflected in his opinion. He stated that, in arriving at a per share valuation, the number of authorized shares is irrelevant. Because the sale of the ESOP shares would extinguish the potential "put" liability regardless of to whom the ESOP sells, Cerar also acknowledged that it would be inappropriate to reduce the value of the Company for a contingent ESOP put liability. Cerar also conceded that the ESOP block of shares should not be valued as a minority. Cerar's opinion that $85 per share was fair is entitled to no weight.

48. Plaintiffs' expert, Brad Akason ("Akason"), is a well-qualified business valuation expert and partner in the firm of Coopers & Lybrand. Akason determined that the fair market value of the ESOP shares as of June 1, 1992 was $184 per share. Akason relied on the income-discounted cash flow method weighing expected returns against inherent risk and by discounting the sum of the estimated future cash flow in order to obtain present value. Akason considered the historical financial performance of the Company for the years ended October 31, 1977 through 1991. He used a four-and-one-half year forecast period ending October 31, 1996 and compared Aetna's performance with a representative group of public companies. He forecasted the cash flows using the following assumptions:

(a) Net sales were forecasted using a growth rate of 6.3%, consistent with Aetna's actual compounded annual growth over the period 1977–1991.

(b) A forecasted earnings before interest and taxes margin was 4.575% based on the 15–year average historical adjusted data.

(c) Income taxes were forecast at a blended rate of 38.8% based on the actual

federal rate in 1992 of 34% and the actual state rate in 1992 of 7.3%.

(d) Depreciation and capital expenditures were forecast based on their historical 15-year average percentage of net sales.

(e) Aetna's change in working capital was forecasted to return to its 15-year average of 13.51% of sales over the following five years.

(f) Available cash flow in the residual period was estimated to grow at 3.9% per year based on an estimate of expected inflation as printed in the "The Blue Chip Indicator."

(g) Excess cash was calculated as the difference between Aetna's actual cash balance as of April 30, 1992 and the level indicated based on applying the industry average cash as a percent of total assets as reported in the 1991 Robert Morris Associates' Industry Averages study.

(h) The weighted average cost of capital is the return required by a company's equity and debt holders. A 15% rate was used to discount future, available debt-free cash flows.

(i) The sum of the present value of cash flows during the forecast period totals $5.8 million; the present value of residual cash flows equals $9.1 million; and the excess cash equals $2.2 million. Based on these figures, Akason concluded that the value of Aetna's total invested capital was $17.1 million.

(j) Akason reduced the value of total invested capital by Aetna's interest-bearing debt. Interest-bearing debt consisted of the outstanding balance owed by the ESOP to Lake Shore National Bank, $150,227, which was guaranteed by Aetna, and another $1,445,000 owed to Officers & Employee Savings. Akason concluded that the value of the common equity of Aetna on a controlling basis was $15.5 million or $184 per share as of June 1, 1992.

49. On February 22, 1996, defendants' expert, Timothy Fagan ("Fagan") of Houlihan Lokey Howard & Zukin, retained after this case was filed, issued a report of his valuation of the ESOP shares at the time of the stock transaction. Fagan was the only expert called to testify by the defendants. He concluded, based on adjusted financial results for twelve months ending April 30, 1992, that the fair market value of the common stock of Aetna Plywood was within the range of $7,200,000 to $7,800,000 in aggregate or $85.30 to $92.41 per share based on 84,411 shares of common stock issued and outstanding. Fagan adopted a market capitalization approach which focused on what a buyer would pay rather than what it would be reasonable for an ESOP seller to demand. He gave no attention to the benefits of the transaction to the buyer as a factor relating to the overall fairness of the transaction.

Fagan identified five valuation steps:

(a) Determination of earnings levels considered to be representative of future operating performance;

(b) Selection of comparable public companies to be used for comparison purposes;

(c) Performance of a comparative risk analysis of the comparable market multipliers;

(d) Selection of appropriate market multiples; and

(e) The determination of the value of total invested capital.

(f) In determining the earnings level considered to be representative of the future operating performance of the Company, Fagan used just the single period—twelve months preceding April 30, 1992, as the representative net earnings to be capitalized. Seven public companies were selected for comparison purposes: Bird Corporation, BMC West Corporation, NCI Building Systems, Inc., Patrick Industries, Inc., Shelter Components Corporation, Waxman Industries, and Wolohan Lumber Company. Aetna was smaller than the

comparables in terms of revenues, total assets, and shareholders' equity, and was found to have weaker growth and slightly weaker profitability. Aetna ranked in the middle level among comparable companies in virtually all other categories. Aetna had stronger leverage, liquidity, and activity ratios. Fagan concluded that Aetna appeared to represent a greater investment risk, for a given return, than the comparables as a group.

(g) Fagan found that the 1992 economy was recovering. Gross Domestic Product rose at 2.0 percent in the first quarter of 1992 and the Consumer Price Index rose 1.0 percent in the first quarter of 1992, reflecting an increase in all sectors of the economy. Indicators, such as new home sales, factory orders and shipments and personal income, all pointed to a mild expansion in the first quarter of 1992. However, Fagan used only a one-year income cycle in determining future performance, rather than using a multiple-year or weighted average income figure. He used the earnings numbers for Aetna for the 12 months preceding the sale, although those numbers were clearly lower than all other recent years. Aetna's sales did recover, and its gross margins remained in the high teens, its net profits affected primarily by increases in administrative expenses, some of which included Davis's own compensation increases and bonuses.

(h) Fagan stated that all six measures examined would have been proportionately increased by the amount that representative net income is increased. An income stream of $1,025,000, which is more representative of Aetna's annual net income than the $750,000 figure utilized by Fagan, increases the Company value by 37% from $85–92 to $116–124.74 per share. Fagan assumed that the Company's excess cash was only $1 million. Using a $3 million excess cash figure as of June 1991, plus the earnings through April 30, 1992, increases the value by $40.28 per share. In 1993 and following years, Aetna's sales rebounded, its gross margins remained

strong and its earnings soared to new heights.

(i) Fagan's observation that the Company's capitalized income stream must be reduced by the amount of its pre-redemption annual contribution to the ESOP plan, because the plan would have to be replaced by some other employee benefit plan, has never been realized and is not supported by events at the time of the transaction or since.

50. The testifying experts applied a similar approach of valuing Aetna as the sum of a future income or cash flow stream to be "capitalized," or converted from the income figure to an amount of capital at an appropriate rate. The multiplier is the inverse of the rate chosen. To this is added the amount of any excess cash on hand which could be distributed to shareholders because it is not needed by the business.

51. The correct income figure to be used for capitalizing is at least $1.025 million, the figure used by Zweifler, whose information on Aetna and its prospects came directly from Davis at the time of the transaction. Zweifler's multiplier was 15 which was also the median multiplier for Fagan's comparables, and is consistent with Akason's analysis of value.

52. Aetna's business operations reasonably had a value of $15 million. Adding $1–2.5 million to reflect excess cash on hand, results in an aggregate company value of $16–$17.5 million.

53. The business operations value is consistent with the net book value approach, based on net equity of $11.99 million, plus $2.8 million appreciated real estate, and 10% for goodwill, resulting in an aggregate value of $16.3 million.

54. Defendant committee members Davis and Francione passively accepted the Zweifler report, ignoring its obvious defects, and passively accepted the Turner valuation reports applicable only to an adjusted book valuation of a minority block

of shares. Davis recognized defects which he chose not to disclose to the others.

55. Based on Aetna's very strong financial condition, its excellent prospects and history, and the valuation evidence at the time of the transaction, the Aetna shares were worth at least book value of $142 per share plus a control premium. A conservative control premium of 20% is well within the ranges reported by the valuation experts. Accordingly, the range of adequate consideration was between $142 and $170 per share. The ESOP fiduciaries failed to obtain adequate consideration for the control shares sold which was no less than the mid-point of the range. The plaintiff class is entitled to damages in the amount of $70 per share for the ESOP's 79,876 shares, less those shares which were in the accounts of the defendants.

56. Of the 79,876 outstanding ESOP shares at the time of the sale, 6,030.94 were owned by Francione and 1,386.28 were owned by Davis. The other 72,458.78 shares were owned by members of the plaintiff class.

57. In settlement with John and Thomsen, on February 11, 1998, the plaintiff class constructively received $800,000. That money is deposited in an interest bearing account. Receipt of that money is contingent on the settlement being approved by the court.

58. At $70 per share for 72,458.78 shares, the total damages for the class are $5,072,114.60.

59. The parties agree that the prime rate at the following dates were as follows. *See* Attachment to Plaintiffs' July 8, 1998 Letter at 8–10; Exhibit A to Defendants' July 10, 1998 Objections to Draft Order.

| | |
|---|---|
| June 1992 | 6.50% |
| December 1992 | 6.00% |
| June 1993 | 6.00% |
| December 1993 | 6.00% |
| June 1994 | 7.25% |
| December 1994 | 8.50% |
| June 1995 | 9.00% |
| December 1995 | 8.65% |
| June 1996 | 8.25% |
| December 1996 | 8.25% |
| June 1997 | 8.50% |
| December 1997 | 8.50% |
| June 1998 | 8.50%. |

60. Using the prime rate to calculate prejudgment interest and compounding the interest every six months on June 30 and December 31, prejudgment interest through December 31, 1997 would be $2,645,411.95 for a total of damages plus interest of $7,717,526.55. The biannual calculations are as follows:

| Through | Days | Principal | Interest | Rate |
|---|---|---|---|---|
| 063092 | 18/366 | 5,072,114.60 | 16,214.14 | 6.50 |
| 123192 | 184/366 | 5,088,328.74 | 153,484.01 | 6.00 |
| 063093 | 181/365 | 5,241,812.75 | 155,961.88 | 6.00 |
| 123193 | 184/365 | 5,397,774.63 | 163,264.20 | 6.00 |
| 063094 | 181/365 | 5,561,038.83 | 199,930.77 | 7.25 |
| 123194 | 184/365 | 5,760,969.60 | 246,853.60 | 8.50 |
| 063095 | 181/365 | 6,007,823.20 | 268,129.97 | 9.00 |
| 123195 | 184/365 | 6,275,953.17 | 273,665.95 | 8.65 |
| 063096 | 182/366 | 6,549,619.12 | 268,695.44 | 8.25 |
| 123196 | 184/366 | 6,818,314.56 | 282,792.39 | 8.25 |
| 063097 | 181/365 | 7,101,106.95 | 299,316.52 | 8.50 |
| 123097 | 184/365 | 7,400,423.47 | 317,103.08 | 8.50 |
| | | 7,717,526.55 | | |

61. Prejudgment interest on $7,717,-526.55 from January 1, 1998 through February 11, 1998 (42 days) at 8.50% interest would be $75,483.75. On February 11, 1998, the plaintiff class received $800,000

from John and Thomsen. Prejudgment interest on $6,917,526.55 from February 12, 1998 through June 30, 1998 (139 days) at 8.50% interest would be $223,919.39. As of June 30, 1998, the damages plus accumulated interest less the offset would be $7,216,929.69.

62. Prejudgment interest on $7,216,-929.69 from July 1, 1998 through July 16, 1998 (16 days) at 8.50% would be $26,-890.48. As of July 16, 1998, damages are $4,272,114.60 and prejudgment interest is $2,971,705.57 for a total of $7,243,820.17.

### III. CONCLUSIONS OF LAW

■ As fiduciaries of the ESOP and directors of Aetna, defendants had obligations of loyalty, care, and fair dealing to the ESOP and its participants who were Aetna shareholders. *Shay*, 100 F.3d at 1488; *Cede & Co. v. Technicolor, Inc.*, 542 A.2d 1182, 1187 (Del.1988). They were required to exercise care, skill, prudence, and diligence in the sale of the Aetna stock held by the ESOP. *See* 29 U.S.C. § 1104(a)(1)(B); *Atwood Grain & Supply Co. v. Growmark, Inc.*, 712 F.Supp. 1360, 1366 (N.D.Ill.1989).

■ Under Delaware law, in a "change of control" transaction, the directors have a heightened obligation to the shareholders to inform themselves fully of the value of a company's shares; maximize value recoverable for all shareholders; and obtain full fair market value on any sale of shares. Decisions under the Delaware *Revlon* doctrine hold that, once the directors have determined to enter the corporation into a "change of control" transaction, the directors owe a duty to obtain the maximum possible price for the selling shareholders. *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, 506 A.2d 173, 182 (Del.1985).

■ In a self-dealing transaction, Delaware corporate and fiduciary law gives no deference to "business judgment" and judicial scrutiny is applied regarding both "fair dealing" and "fair price." *Unitrin*

*Inc. v. American General Corp.*, 651 A.2d 1361, 1372 (Del.1995); *Mills Acquisition Co. v. Macmillan, Inc.*, 559 A.2d 1261, 1280 (Del.1989); *David J. Greene Co. v. Schenley Industries, Inc.*, 281 A.2d 30, 32 (Del.Ch.1971). Fair dealing focuses on the procedures used in seeking a buyer and fair price on whether the directors obtained the highest value reasonably available. *Mills*, 559 A.2d at 1280.

The June 1992 ESOP sale was a prohibited transaction under § 406(a) of ERISA, 29 U.S.C. § 1106(a), as a sale between the plan and a party in interest. The transaction was only exempt if it can be shown by the defendants that the Plan received "adequate consideration." 29 U.S.C. § 1108(e)(1). Adequate consideration means "the fair market value of the asset as determined in good faith by the trustee or named fiduciary pursuant to the terms of the plan and in accordance with regulations promulgated by the Secretary [of Labor]." 29 U.S.C. § 1002(18)(B). The principal focus is on the thoroughness of the fiduciary's investigation. *Shay*, 100 F.3d at 1488.

■ The transaction in which Aetna redeemed more than 95% of the outstanding shares involved self-dealing. The transaction bore a heightened scrutiny standard, on which the defendants bear the burden of proving that the transaction was fair and of benefit to the ESOP shareholders. *Id.*; *Cede*, 634 A.2d at 361.

A fiduciary who engages in a self-dealing transaction pursuant to 29 U.S.C. § 1108(e) has the burden of proving that he fulfilled his duties of care and loyalty and that the ESOP received adequate consideration. [*Cunningham*, 716 F.2d] at 1467–68; *see also Marshall v. Snyder*, 572 F.2d 894, 900 (2d Cir. 1978). This burden is a heavy one. When it is "possible to question the fiduciaries' loyalty, they are obliged at a minimum to engage in an intensive and scrupulous independent investigation of their options to insure that they act in

the best interests of the plan beneficiaries." *Leigh v. Engle,* 727 F.2d 113, 125–26 (7th Cir.1984).

Although securing an independent assessment from a financial advisor or legal counsel is evidence of a thorough investigation, *Martin v..Feilen,* 965 F.2d 660, 670–71 (8th Cir.1992), it is not a complete defense to a charge of imprudence. *See [Donovan v.] Mazzola,* 716 F.2d [1226,] 1234 [ (9th Cir.1983) ]. As Judge Friendly has explained, independent expert advice is not a "whitewash." *Donovan v. Bierwirth,* 680 F.2d 263, 272 (2d Cir.1982); *Donovan v. Walton,* 609 F.Supp. 1221, 1227 n. 10 (S.D.Fla.1985); *Cator v. Herrgott & Wilson, Inc.,* 609 F.Supp. 12, 16 (D.C.Cal.1984). The fiduciary must (1) investigate the expert's qualifications, *Mazzola,* 716 F.2d at 1234, (2) provide the expert with complete and accurate information, *Cunningham,* 716 F.2d at 1467, and (3) make certain that reliance on the expert's advice is reasonably justified under the circumstances. *Id.* at 1474; *see also* Jordan, Pflepsen, Jr., & Goldberg, *ERISA Litigation Handbook,* § 3.03[A] (1994).

*Shay,* 100 F.3d at 1488–89.

Directors must represent the interests of all shareholders alike and owe a fiduciary duty not to favor one shareholder over another. It thus has long been the law that directors' actions to enrich themselves, or favor one shareholder unequally over another, are illegal and invalid breaches of the fiduciary duties.

The evidence clearly shows that there was no compelling need to sell the Aetna shares held by the ESOP in May of 1992. Neither the Company's "put liability" nor existing business conditions required that Aetna buy, or that the ESOP sell, the Aetna stock. The reality is that the motive behind the transaction, at least from the point of view of Davis and Francione, was the transfer of control and ownership to Davis. It is arguable, therefore, that since the transaction was not for the bene-fit of the ESOP participants, that it could be set aside. The plaintiff class, however, does not seek to avoid the sale, but rather seeks to obtain adequate consideration, as that term is defined under ERISA and understood under Delaware law.

Under ERISA, adequate consideration is itself an objective standard. *Cosgrove v. Circle K Corp.,* 871 F.Supp. 1248, 1251 (D.Ariz.1994); *Reich v. Valley National Bank of Arizona,* 837 F.Supp. 1259, 1293 (S.D.N.Y.1993). Whether the fiduciary violated his or her duties, however, is not purely a question of whether the amount of consideration satisfied an objective standard of adequate consideration. Instead, it must be considered whether the fiduciary conducted a prudent and sufficient investigation and employed sound principles of evaluation in accepting the appraisals and other means for determining the consideration to be paid. As long as the fiduciary's conduct was objectively reasonable in determining the consideration to be paid, no fiduciary violation occurs even if the consideration paid differs somewhat from what the court determines to be adequate consideration. *Cunningham,* 716 F.2d at 1467–68; *Eyler v. Commissioner,* 88 F.3d 445, 454–55 (7th Cir. 1996).

Section 1002(18)(B) of ERISA requires that in the case of a plan asset, other than a security for which there is a generally recognized market, adequate consideration means fair market value determined in good faith according to the terms of the plan and in accordance with regulations promulgated by the Secretary of Labor. It is conceded that there was no generally recognized market for the Aetna shares.

Fair market value is defined as "the price at which an asset would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, and both parties are able, as well as willing, to trade

and are well informed about the asset and the market for such asset." Proposed Regulation, § 2510.3–18(b)(2)(i), 53 Fed. Reg. 17637. *See also Cosgrove v. Circle K Corp.*, 915 F.Supp. 1050, 1064 (D.Ariz. 1995), *aff'd by unpublished order*, 107 F.3d 877 (9th Cir.1997). The fair market value is to be determined as of the date of the transaction. Proposed Regulation § 2510.3–18(b)(2)(ii). The facts establishing value are to be set forth in written documentation meeting certain prescribed standards. Proposed Regulation §§ 2510.3–18(b)(2)(iii), (b)(4).

The "good faith" requirement establishes an objective rather than a subjective standard of conduct, the assessment of which is to be made in light of all relevant facts and circumstances. Relevant facts and circumstances will include a showing of a prudent investigation of circumstances prevailing at the time of the valuation, and the application of sound principles of evaluation. Proposed Regulation § 2510.3–18(b)(3).

The "good faith" standard also requires that the fiduciary making the evaluation, or the appraiser on whose report the fiduciary relies, be independent of all parties to the transaction other than the plan. Proposed Regulation § 2510.3–18(b)(3)(ii). A person is not independent if that person is directly or indirectly under the control of any party to the transaction. Control is further defined to mean the power to exercise a controlling influence over the management or policies of that person. Proposed Regulation § 2510.3–18(b)(3)(iii). All relevant facts and circumstances are to be considered.

Based on the facts as found in this case, it is clear that the Turner valuations did not meet the good faith requirement. Turner had for many years given advice to the Davis family concerning their control of the Company. His proposed services related to the transaction were directed at obtaining control of the Company for Davis. He was in no sense independent of Davis or Aetna.

In the supplementary information published in connection with the Proposed Regulation, the Secretary states:

> [A]n appraiser will be considered independent of all parties to a transaction (other than the plan) only if a plan fiduciary has chosen the appraiser and has the right to terminate the appointment, and the plan is thereby established as the appraiser's client. Absent such circumstances, the appraiser may be unable to be completely neutral in the exercise of his function.

Proposed Regulation, Supp. Information § B(3), 53 Fed.Reg. 17635.

The Zweifler and Cerar valuations are also open to the objection that Turner and Davis selected and dealt with them concerning the transaction. There is no evidence that either appraiser ever reported to, or conferred with, John or Thomsen, the only independent fiduciaries, either before or after the May 5, 1992 resolution approving the transaction.

An independent valuation is not obtained by fixing a price, as in the Aetna May 5, 1992 board resolution, and then obtaining appraisals in confirmation of that price. A prudent investigation must precede, not follow, the valuation of an ESOP asset.

Moreover, the determination of a specific price—rather than the development of a price range—necessarily precluded any negotiations by the independent fiduciaries on behalf of the ESOP participants for the best price available. As stated by the Secretary:

> The Department is aware that the fair market value of an asset will ordinarily be identified by a range of valuations rather than a specific set figure. It is not the Department's intention that only one valuation figure will be acceptable as the fair market value of an asset. Rather, this proposal would require that the valuation assigned to an asset must reflect a figure within an acceptable range of valuations for that asset.

Proposed Regulation, Supp. Information § B(2), 53 Fed.Reg. 17634.

Defendants' appraisals and expert testimony also fail in presenting any analysis of the fairness of the transaction by comparing the benefits that were to be obtained by Davis as a result of the repurchase with the price to be received by the plaintiff class. As stated by an expert, recognized as such by the parties:

> Fairness from a financial point of view must also consider relative fairness to the ESOP compared to other parties to the transaction. Arguably, an ESOP could pay no more than fair market value for its stock yet receive a deal which was unfair compared to other investors. Financial fairness may also consider the terms of the financing and the ultimate equity allocation in a multi-investor, leveraged ESOP transaction.

James H. Zukin, ed., *Financial Valuation: Businesses and Business Interests* ¶ 8.9 (Appendix).

The Proposed Regulation for the determination of adequate consideration specifies the content of valuation documents. When, as here, the asset is a security for which there is no generally recognized market, a special rule requires that additional information be contained in any appraisal. Proposed Regulation § 2510.3-18(b)(4)(ii), 53 Fed.Reg. 17638. The factors particularly relevant to this case are the "economic outlook in general and the condition and outlook of the specific industry;" "the book value of the securities and the financial condition of the business;" "the earning capacity of the company;" "the dividend-paying capacity of the company;" "whether or not the enterprise has goodwill or other intangible value;" "the market price of securities of corporations engaged in the same or similar lines of business, which are traded in a free and open market"; "the marketability of the securities;" and "whether or not the seller would be able to obtain a control premium from an unrelated third party with regard to the block of securities being valued."

With respect to a control premium, the Secretary has stated that "a plan selling control should receive a control premium." Proposed Regulation, Supp. Information § B(5), 53 Fed.Reg. 17636.

When all aspects of the Aetna buy-back transaction are considered, it is clear that no marketability reduction was appropriate. The stock purchased was not burdened by a "put" option, but was retired. Moreover, a control premium was clearly required. Sole control of the Company was obtained by defendant Davis essentially without any cost to him. The benefits of the transactions to Davis included the opportunity for substantial dividends, an increased salary, large bonuses and the acquisition of company property. An analysis of the potential benefits to the buyer was and is a necessary part of establishing the fair market value of the ESOP shares.

■ As the defendants point out, a court reviewing an issue of adequate consideration is not initially called upon to redetermine the valuation of an asset *de novo*. Rather, it is to consider whether the price of the asset was determined in good faith by way of a prudent investigation and the application of sound principles of business valuation. *Cunningham*, 716 F.2d at 1467–68; *Eyler*, 88 F.3d at 454–55. The facts in this case show that the defendants' valuation of the ESOP participants' Aetna stock at $85.75 per share fails to meet the requirements of good faith, prudent investigation and sound principles of business evaluation. In finding that the plaintiff class is entitled to recover damages for inadequate consideration, certain valuation errors which are contrary to sound principles of business valuation have been rejected, but, otherwise, the appraisal analysis which is not in dispute has been followed. As the findings indicate, it has not been necessary to make a *de novo* determination of value in order to conclude that the plaintiff class is entitled to recover an additional sum for its shares.

On the facts presented, defendants Davis, Francione and Aetna Plywood, Inc. are clearly liable to the plaintiff class, both under ERISA and applicable Delaware law, for having failed to sell the stock for adequate consideration.

■ ERISA plaintiffs are not entitled to receive a double recovery of damages. *Mira v. Nuclear Measurements Corp.*, 107 F.3d 466, 473 (7th Cir.1997); *Central States, Southeast & Southwest Areas Pension Fund v. Bell Transit Co.*, 22 F.3d 706, 713 (7th Cir.1994). The federal common law has been held to include the concept of offset. *See Corder v. Brown*, 25 F.3d 833, 839 (9th Cir.1994). There is no reason why that rule should not be applied under the circumstances of the present case. Any damages recoverable from John and Thomsen would have been on the same basis as the award against the other defendants, a below market value price being paid for the ESOP stock. The $5,072,-114.60 in damages is based on the full underpayment of value. Any additional recovery from John and Thomsen would be a double recovery windfall. The amount received from John and Thomsen as a settlement of the claims against John and Thomsen is an offset against the damages awarded against defendants Aetna Plywood, Davis, and Francione.

■ The parties agree that, under ERISA, plaintiffs are entitled to an award of prejudgment interest.[3] *See Lorenzen v. Employees Retirement Plan of Sperry & Hutchinson Co.*, 896 F.2d 228, 236 (7th Cir.1990). Prejudgment interest is viewed as a form of compensatory damage designed to make the plaintiff whole and place him or her in the same position as if no violation had occurred. *City of Milwaukee v. Cement Division, National Gypsum Co.*, 515 U.S. 189, 195, 115 S.Ct. 2091, 132 L.Ed.2d 148 (1995); *Lorenzen*, 896 F.2d at 236; *Cement Division, National Gypsum Co. v. City of Milwaukee*, 144 F.3d 1111, ——, 1998 WL 270027 *1 (7th Cir.1998); *Hizer v. General Motors Corp.*, 888 F.Supp. 1453, 1463 (S.D.Ind. 1995). There is also a goal of avoiding unjust enrichment for the wrongdoer. *Lorenzen*, 896 F.2d at 236; *Wells v. United States Steel*, 76 F.3d 731, 738 (6th Cir. 1996); *Dimensions Medical Center, Ltd. v. Aetna Life Insurance Co.*, 1997 WL 534548 *4 (N.D.Ill. Aug.26, 1997).

The Seventh Circuit has held that the prime rate is generally the appropriate rate to use for prejudgment interest. *National Gypsum*, 144 F.3d 1111, 1112–13; *In re Oil Spill by the Amoco Cadiz Off the Coast of France on March 16, 1978*, 954 F.2d 1279, 1331 (7th Cir.1992); *Partington v. Broyhill Furniture Industries, Inc.*, 999 F.2d 269, 274 (7th Cir.1993); *Barrow v. Falck*, 11 F.3d 729, 732 (7th Cir.1993). Also, the interest should be compounded so as to more closely put the plaintiff in the position he or she otherwise would have been in. *National Gypsum*, 144 F.3d 1111, 1112–1113; *Neal v. Honeywell, Inc.*, 995 F.Supp. 889, 897 (N.D.Ill.1998); *Hizer*, 888 F.Supp. at 1465; *United States v. Mason Tenders District Council of Greater New York*, 909 F.Supp. 891, 895 (S.D.N.Y. 1995).

Plaintiffs argue the appropriate prejudgment interest rate is the amount earned by the Aetna Plywood Inc. Profit Sharing Plan, which is where the proceeds of the ESOP stock sale were placed. However, none of the cases cited by plaintiffs actually award prejudgment interest based on what was earned by a fund involved in the particular case. Plaintiffs cite *Leigh v. Engle*, 619 F.Supp. 154, 160 (N.D.Ill.1985). The discussion in that case, however, concerns the direct calculation of damages,

---

**3.** There is no contention that an award of prejudgment interest is also supported by Delaware law. *See generally Gaffin v. Teledyne, Inc.*, 611 A.2d 467, 476 (Del.1992); *Ryan v. Tad's Enterprises, Inc.*, 709 A.2d 682, 705 (Del.Ch.1996), *aff'd by unpublished order*, 693 A.2d 1082 (Del.1997); *Reeves v. McReynolds*, 1996 WL 342100 *4 (Del.Ch. June 12, 1996); 6 Del.C. § 2301(a). Therefore, only ERISA law is considered for purposes of determining an appropriate rate of prejudgment interest.

not any award of prejudgment interest. In subsequent proceedings in that case, it was determined that no prejudgment interest would be awarded. *See Leigh v. Engle,* 669 F.Supp. 1390, 1405–06 (N.D.Ill. 1987), *aff'd,* 858 F.2d 361 (7th Cir.1988), *cert. denied,* 489 U.S. 1078, 109 S.Ct. 1528, 103 L.Ed.2d 833 (1989). Similarly, *Eaves v. Penn,* 587 F.2d 453 (10th Cir.1978), involves the question of damages and no issue of prejudgment interest. At trial in the present case, plaintiffs sought damages in the form of the difference between the price at which the stock was sold and its fair market value. Such damages are being awarded and the present question is the appropriate method of calculating prejudgment interest, not the appropriate method of calculating damages. Plaintiffs also cite *Russo v. Unger,* 845 F.Supp. 124, 126 (S.D.N.Y.1994) (quoting *Diduck v. Kaszycki & Sons Contractors, Inc.,* 974 F.2d 270, 286 (2d Cir.1992)), for its statement that "assessing the appropriate amount of interest requires a comparison of what the plan earned during the time in question and what it would have earned had the money lost due to the breach been available." *Russo,* 845 F.Supp. at 127, however, declined to use the rate of return that the retirement plan had earned and instead used the Internal Revenue Code interest rate for tax underpayments and overpayments. *See* 26 U.S.C. § 6621. Plaintiffs also cite *Mason Tenders,* but, like *Russo,* that case uses the § 6621 rate, not the actual amount earned by the fund involved in the case. *Mason Tenders,* 909 F.Supp. at 895.

Although not cited by plaintiffs, *Rybarczyk v. TRW, Inc.,* 1997 WL 580609 *3–4 (N.D.Ohio Sept.5, 1997), awards prejudgment interest based on the actual rate of return the defendant earned while holding the improperly retained funds. That is the only ERISA case this court has found that awards prejudgment interest based on an amount actually earned. A number of other cases were found, though, that expressly recognize that prejudgment interest is designed to make the plaintiff whole, but still use external rates that are independent of any rate actually earned by a fund or party. *See Kinek v. Paramount Communications, Inc.,* 22 F.3d 503, 514 (2d Cir.1994) (discount rate); *Thomas v. Board of Trustees of International Union of Operating Engineers, Local 542, Pension Fund,* 1998 WL 334627 *13 (E.D.Pa. June 24, 1998) (postjudgment interest treasury bill rate provided for in 28 U.S.C. § 1961); *Haberern v. Kaupp Vascular Surgeons, Ltd.,* 1995 WL 312508 *1 (E.D.Pa. April 28, 1995) (same); *Kay v. Thrift & Profit Sharing Plan for Employees of Boyertown Casket Co.,* 780 F.Supp. 1447, 1462 (E.D.Pa.1991) (same); *Mason Tenders, supra* (Internal Revenue Code interest rate); *Russo, supra* (same).

There is no evidence regarding investment decisions made by the Profit Sharing Plan. It is unknown whether receiving almost twice as much in proceeds would have affected that Plan's investment decisions. There is also no evidence regarding how many members of the plaintiff class have or were eligible to withdraw some or all of their funds out of the Profit Sharing Plan. The prime rate represents a reasonable rate of return that makes a party whole. Also, damages and interest through July 16, 1998 of over seven million dollars plus an award of attorney fees (and another $800,000 from John and Thomsen which apparently was partially or wholly funded by Aetna Plywood) will not leave Aetna Plywood, Davis, or Francione unjustly enriched despite their wrongdoing.

Prejudgment interest will be based on the prime rate, with interest compounded biannually on June 30 and December 31. As of July 16, 1998, the damages to be awarded against Aetna Plywood, Davis, and Francione are $4,272,114.60 (taking into account the offset) and accumulated prejudgment interest is $2,971,705.57.

Federal Rule of Civil Procedure 54(b) permits the entry of a judgment as to less than all the parties. *See Lawyers Title Insurance Corp. v. Dearborn Title Corp.,*

118 F.3d 1157, 1162–63 (7th Cir.1997). The present situation, however, is not an appropriate one for entering a final judgment as to Aetna Plywood, Davis, and Francione since the judgment to be entered against these parties relies in part on resolution of the claims against John and Thomsen. Until a determination is made as to the fairness of the settlement with John and Thomsen, no final determination can be made as to the precise amount of damages. If the settlement is approved, then application of the $800,000 setoff is appropriate. However, if it is not approved, then no setoff is appropriate. Also, if the settlement is not approved, findings and conclusions will have to be entered as to John and Thomsen and any appeal that might be taken would have substantial factual and legal overlap with any appeal that might be taken by the other parties. No Rule 54(b) judgment will be entered at this time. A judgment will be entered based on the assumption that the settlement will be approved and awarding prejudgment interest through July 16, 1998. Since no Rule 54(b) finding is being made, the judgment will not be final and appealable, except possibly as to injunctive relief that is ordered, until judgment is also entered as to John and Thomsen.

It is recognized that this court does not lose jurisdiction to hear motions for reconsideration until more than 10 days after a final judgment is entered. Fed.R.Civ.P. 59(e). Because of the time necessary to issue notice to the class and hold a hearing on the fairness of the settlement, there will be a delay before a final judgment is entered. However, there is no good reason to delay any possible motions for reconsideration. As a prudential matter based on sound judicial case management, this court will decline to consider any motions for reconsideration regarding today's order that are filed more than 10 days (as mea-

sured by Fed.R.Civ.P. 6(a)) beyond the date the judgment as to Aetna Plywood, Davis, and Francione is entered on the docket.

In light of the fiduciary violations that have been found, defendants Davis and Francione will be removed and barred from any fiduciary capacity with the Aetna Plywood Inc. Profit Sharing Plan. Within one week from the date of today's order, the parties shall meet to discuss an appropriate method of replacing Davis and Francione in their fiduciary positions. By July 30, 1998, the parties shall submit a single brief (or separate briefs if they could not agree) setting forth their proposal as to this issue.

Plaintiffs request an award of fees as against defendants Aetna Plywood, Davis, and Francione. Seventh Circuit case law recognizes two tests for awarding attorney fees in an ERISA action such as the present one.[4]

> The first looks simply at whether the losing party's position was substantially justified, and the second ... looks to the following factors:
>
>> (1) the degree of the offending parties' culpability or bad faith; (2) the degree of the ability of the offending parties to satisfy personally an award of attorneys' fees; (3) whether or not an award of attorneys' fees would deter other persons acting under similar circumstances; (4) the amount of benefit conferred on members of the pension plan as a whole; and (5) the relative merits of the parties' positions.

*Brewer v. Protexall, Inc.,* 50 F.3d 453, 458 (7th Cir.1995).

██ Here, defendants' position in the litigation was not substantially justified. As previously stated, errors in the valuations and defendants' liability are clear. Defendants underpaid plaintiffs by almost

---

4. Plaintiffs do not contend they are entitled to a fee award under Delaware law. *See gener-* *ally Ryan,* 709 A.2d at 706.

50%. They ignored evident errors in the valuation reports, one of which Davis admitted that he had recognized, and made no attempt to obtain an independent valuation of the stock. Defendants' position in this litigation that they paid fair market value for the stock is not substantially justified. That is a sufficient basis for awarding fees against all three liable defendants. A fee award is further justified by the fact that defendants acted intentionally and with a motive to greatly enrich themselves.

As against defendants Aetna Plywood, Davis, and Francione, plaintiffs are awarded their reasonable costs and attorney fees. The award of attorney fees is for the ERISA claims against Aetna Plywood, Davis, and Francione. By August 3, 1998, plaintiffs shall file their motion for fees and costs and accompanying brief. At least one week prior to that date, plaintiffs must provide a draft of their motion to defendants so that the parties can seek to settle any differences they may have as to fees. Also, plaintiffs' motion must clearly set forth any adjustment or exclusions made for legal work done regarding the Delaware law claims and the claims against John and Thomsen and the brief in support of the motion must address the related legal issues.

Additionally, class counsel has indicated that he will seek fees from the class representing one-third of the class's recovery. *See generally Cook v. Niedert,* 142 F.3d 1004 (7th Cir.1998). Any motion and the supporting brief for such a request must be filed by August 3, 1998. Such motion must include a copy of any fee agreement between named plaintiff and counsel. The motion must also set forth the total number of hours reasonably expended on the case and what the fee would be if based on an hourly rate. No determination has yet been made as to whether such a fee award is appropriate. But if such a percentage basis fee is awarded, it will be based on a percentage of the damages, settlement, and prejudgment interest actually collect-

ed by the plaintiff class. Contrary to what counsel has indicated, any statutory fee award to be paid by defendants will not be included in the pool from which the percentage fee award is calculated.

IT IS THEREFORE ORDERED that:

(1) Findings of Fact, Conclusions of Law, and Order dated June 11, 1998 are vacated.

(2) Enter Amended Findings of Fact and Conclusions of Law.

(3) The Clerk of the Court is hereby directed to enter a judgment on the merits in favor of the plaintiff class and against defendants Aetna Plywood, Inc., Jeffrey Davis, and John Francione:

(a) In the amount of $4,272,114.60 damages and $2,971,705.57 prejudgment interest for a total of $7,243,820.17;

(b) Removing defendants Jeffrey Davis and John Francione from any fiduciary capacity with the Aetna Plywood, Inc. Profit Sharing Plan and barring them from ever again serving in such a capacity; and

(c) Awarding the plaintiff class their reasonable costs and attorney fees.

(4) By July 30, 1998, the parties shall file position briefs regarding the replacement of Davis and Francione in their fiduciary capacities.

(5) Payment of the judgment amounts shall be made to the LaSalle National Bank account administered by Class Counsel with the funds held in trust until further order of the court.